[S. F. No. 13079. In Bank.—January 30, 1929.]

CITY OF OAKLAND (a Municipal Corporation) et al., Petitioners, v. HARRY G. WILLIAMS, as Auditor, etc., Respondent; WILLIAM F. HAMMER, Intervener.

Markell C. Baer, Fitzgerald, Abbott & Beardsley and Orrick, Palmer & Dahlquist for Petitioners.

Preston Higgins, City Attorney and Alfin N. Nelson, Chief Deputy City Attorney for Respondent.

Thelen & Marrin for Intervener.

Perry Evans, *Amicus Curiae.*

SEAWELL, J.—Petition for a writ of *mandamus* to compel Harry G. Williams, as the auditor of the City of Oakland, county of Alameda, to certify that there remained unexpended and unapplied a balance of an appropriated fund applicable to pay the estimated expense of a certain contract, according to the freeholders' charter of the city of Oakland, section 131, awarded by the board of port commissioners of the City of Oakland to the J. G. Wilson Corporation for furnishing rolling steel door supplies proposed to be used in the construction of a warehouse which said board of port commissioners had contracted to construct and lease to Rosenberg Bros. & Co., a private corporation extensively engaged in packing, processing and shipping dried fruits and related products in large shipments to domestic and foreign ports. Said warehouse, according to plans, will cost approximately $400,000 and occupy about seven acres of the hundreds of acres of vacant tide and submerged lands, filled and unfilled, lying between the uplands of said City of Oakland and the low-water marks of the San Francisco Bay and the Estuary San Antonio, which lands were granted by the state to said city by an act approved May 1, 1911 (Stats. 1911, p. 1258), in trust for the uses and purposes therein named. Said warehouse is to be constructed at the Fourteenth Street Wharf Terminal, parallel to an existing transit shed of equal length and separated from said shed by public spur railroad tracks.

The authority of the board of port commissioners to enter into the lease and contract with said Rosenberg Bros. & Co. was challenged by two suits instituted in the superior court of the county of Alameda, wherein an injunction was sought in each action against said board and certain officials of said city, commanding them to desist and refrain from doing any act under or incurring any liability or obligations against said city by reason of said lease and contract, which threatened acts were claimed to be in excess of the power of said board on the ground that said contract attempted to obligate said city to expend $400,000 of its funds for a private purpose. The auditor, as a measure of protection to himself and bondsmen, declined to indorse his certificate upon said lease and contract. By reason of the public importance of the matter the suits commenced

in the county of Alameda were held in abeyance and this proceeding was instituted for the purpose of expediting the determination of the questions raised in said actions.

The main point pressed by intervener William F. Hammer, who was the plaintiff in the actions instituted in the superior court of the county of Alameda, is that said lease attempts to authorize the use of public funds for a private purpose, in violation of article I, section 14, state constitution.

The importance of the development of the natural harbor and seaport advantages which the City of Oakland, situate on the easterly side of the San Francisco Bay, with direct and spacious connection with the Pacific Ocean, offers to the immense agricultural and commercial districts of northern and central California, is not questioned. It is admitted that said city and port is the terminus of three transcontinental railroads and one intrastate railroad. In addition to these transportation lines, an immense volume of agricultural, orchard, dairy and general farm and ranch products of the state and factory products from without, is also carried into said city by many public transportation companies and by private conveyances, destined for foreign shipment, but because of the lack of reasonable harbor development and improvements vessels of reasonable tonnage were unable to enter said harbor. It is alleged, and not denied, that the declared policy on the part of the City of Oakland, which had been the subject of long public discussion, to adopt a comprehensive and concrete program of development has attracted and is still attracting manufacturers in all industrial lines to establish large factories and plants in said city and territory adjacent thereto, because of its favorable situs for the transportation of commerce to domestic and foreign ports and countries by both land and sea. Responding to this growing demand, the City of Oakland submitted the proposition of issuing bonds in the amount of $9,960,000, to be known as the Oakland Harbor Improvement Bonds, to the electors of said city, which issue was duly approved May 18, 1926. Said bond issue was for the following purposes:

"The acquisition, construction and completion by the City of Oakland of a certain municipal improvement on or near the Estuary of San Antonio and on or near the

western waterfront of said city, consisting of systems of wharves, docks, piers, slips, bulkheads, quays, and terminal facilities, including channels, water ways, turning basins, courses and docking spaces, roadways, trackage and approaches, transit sheds, warehouses, cold storage facilities, mechanical handling appliances, construction and maintenance equipment, fire boat and house therefor, the extension of the high pressure fire system of said city to said improvement, and such works, structures and property as may be necessary or convenient for the accommodation of shipping by rail or water, and also lands, rights of way, and other easements, property and property rights, necessary or appurtenant to said municipal improvement.''

In furtherance of said comprehensive scheme of harbor development and improvement, and pursuant to the recommendation made by its consulting engineers, the city amended its freeholders' charter (chap. 7, Stats. and Amdts. 1927, p. 1978) by providing for the establishment of a ''port department.'' Said charter amendment provides for the creation of a board of port commissioners, consisting of five members, vested with the exclusive control and charge of said harbor, as the successor of all the rights and powers formerly exercised by said city, and it is charged with the performance of all the duties formerly imposed upon said city, and is given such legislative and administrative powers as were deemed necessary to enable it ''to promote and more definitely insure the comprehensive and adequate development of the Port of Oakland through continuity of control, management and operation.'' The tide and submerged lands granted by the state to said city include an inner and an outer harbor. The inner harbor consists of a deep, navigable channel, known as the Estuary of San Antonio, which penetrates inland a distance of about six miles. The channel of this estuary is too narrow to permit the convenient turning and docking of ocean-going vessels. The outer harbor consists of basins, channels and other waters of San Francisco Bay. The board of port commissioners, in the exercise of the powers conferred upon it by said charter amendment and also by the ''Oakland Harbor Improvement Bonds'' proposition, completed, in October, 1927, at a cost in excess of $500,000, the construction of a large concrete wharf and transit shed,

with necessary approaches and other facilities, situate in the outer harbor near the terminus of Fourteenth Street, known as the Fourteenth Street Wharf and Terminal, which is designed for and is to be operated as a general cargo terminal. In April, 1928, a large pier, known as the Grove Street Pier, was completed at a cost of $920,000. Lands known as the Brooklyn Basin Area, upon which said board proposes to erect a wharf and transit shed at a cost of $600,000, were acquired at a cost of $265,000. Said board of commissioners has taken over the control and management, and now operates directly or by lease, a number of terminal piers, wharfs and harbor facilities for the accommodation of shipping by rail and water. Appropriations in excess of $5,000,000 have been made by the federal government from time to time and have been expended in improving the waterways of said port, and this sum has been greatly supplemented by the City of Oakland and private interests for the dredging, deepening and widening of the inner and outer harbors and the reclaiming of adjacent waste tide-lands.

The warehouse, now in course of completion pursuant to and under the lease contract made by said board with Rosenberg Bros. & Co., is built upon reclaimed tide and submerged lands which constitute a portion of the western waterfront of said city, at the rear of and adjacent to said Fourteenth Street Wharf Terminal, and parallel to an existing transit shed and separated therefrom by a public street and spur railroad tracks and thus, it is alleged, forms an adjunct to said Fourteenth Street Wharf Terminal. The building is to be of the warehouse and storage type, constructed of standard concrete, and is similar in style, structure and height to said transit shed.

The act of 1911 granting said tide and submerged lands, whether filled or unfilled, to the City of Oakland, provides:

"(a) That said lands shall be used by said city and its successors only for the establishment, improvement and conduct of a harbor and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures and appliances necessary or convenient for the *promotion,* and *accommodation* of commerce and navigation and said city or its successors shall not at any time grant, convey, give or alien said lands

or any part thereof to any individual, firm or corporation for any purpose whatever; provided that said city or its successors may grant franchises thereon for limited periods, for wharves and other public uses and purposes and *may lease* said lands or any part thereof for limited periods for purposes consistent with the trusts upon which said lands are held by the state of California and with the requirements of commerce or navigation at said harbor." (Italics supplied.)

Section 718 of the Civil Code (Stats. 1927, p. 1173) provides that the tide and submerged lands granted to any city by the state may be leased for a period not exceeding fifty years, unless a greater term is fixed by the state's grant of the said lands. Said section further provides: " . . . tidelands and submerged lands owned or controlled by any city, together with the wharves, docks, piers and other structures or improvements thereon and so much of the uplands abutting thereon as may in the judgment of the city council, or other governing body of the city be necessary for the proper development and use of its water front and harbor facilities, may be leased for a period not exceeding fifty years. Said tidelands, submerged lands and uplands may be leased only for *industrial uses,* the purpose of improvement and development of the harbor of said city, and the construction and maintenance of wharves, docks, piers or bulkhead piers or for other public uses and purposes consistent with the requirements of commerce or navigation at said harbor." (Italics supplied.)

The act whereby said tide and submerged lands, both filled and unfilled, were granted by the state of California to said City of Oakland; the resolution or ordinance adopted upon the submission of the proposition to incur a bonded indebtedness in the sum of $9,960,000, and the amendment of the freeholders' charter of said city, constitute the several steps taken by said City of Oakland over a period of several years in the consummation of a long considered and comprehensive plan for harbor and industrial development and improvement of its waterfront area. The powers conferred upon the board of port commissioners by the amended charter (Stats. and Amdts. 1927, p. 1978) are many and the duty enjoined upon it to support and foster all *aids* to promote the commercial welfare of said port

is repeated in a number of sections of said charter, a portion of which we quote:

"To make provision for the needs of commerce, shipping and navigation of the port, to promote, develop, construct, reconstruct, alter, repair, maintain, equip and operate all waterfront properties, including piers, wharves, sea walls, docks, basins, channels, slips, landings, warehouses, floating or other plants or works, dredge and reclaim land, construct, equip and operate terminal trackage with sidings and turnouts and railroad connections between docks, piers and other port structures, and connect the same with main line tracks, and to establish, equip and operate all other facilities or aids incident to the development, protection and operation of the port, as may be deemed proper and desirable in its judgment, and it may modify its plans from time to time as the requirements of commerce, shipping and navigation may demand, and as part of such development and operation to provide for tugs, dredges, fireboats, barges, cold storage plants and other publicly owned facilities or appliances incident to the operation of the port, of such number and character and in such places as the board may deem feasible and proper.

"To take charge of, control and supervise the Port of Oakland, including all the waterfront properties, and lands adjacent thereto, or under water, structures thereon, and approaches thereto, storage facilities and other utilities, and all rights and interests belonging thereto, which are now or may hereafter be owned or possessed by the city of Oakland, including all salt or marsh or tide lands and structures thereon granted to the city of Oakland in trust by the state of California for the promotion and accommodation of commerce and navigation."

■ It is not claimed by intervener that there was not then or that there was not at any time subsequent remaining sufficient unexpended and unapplied funds of said bond issue to pay the estimated expense of said lease contract or that the proceedings adopted by said city are in any way faulty, but it is claimed that the expenditure of public moneys for the construction of said warehouse for the uses to be made of it by the lessee amounts to lending the credit of the state, which is inhibited by article IV, section 31, state constitution, in aid of said lessee in

its private business enterprise, and further, that it amounts to taxation for private purposes, which is a violation of the federal constitution as well as of the state constitution.

Public notice of intention to lease to the highest bidder, for a term of ten years, the filled parcel of tide-lands, which is the subject of this proceeding, comprising approximately seven acres, together with a warehouse to be erected thereon by said board at the cost of approximately $400,000, and calling for bids thereunder, was duly published and circulated. The notice sets out the form of lease adopted by said board, which is very full as to its purpose and the mutual obligations of lessor and lessee. It provides, among many other things, that said warehouse shall be used for the purpose of receiving, storing, warehousing, preparing and otherwise handling goods and for shipping the same and for other industrial uses which will promote commerce and shipping, but for no other purpose without the written consent of the lessor. The lessee is limited in the conduct of his business by the purposes above mentioned. The lessee shall be required to route for shipment by water from said Fourteenth Street Wharf Terminal, adjacent to said premises, all goods which shall be owned or the shipment of which shall be controlled by the lessee, and which shall be shipped by water in the conduct of said business, whether produced or packed at said warehouse or elsewhere, and which can be conveniently shipped from said terminal and not in excess of the cost to the lessee or consignee at which such goods may be shipped from any other established cargo pier, dock or terminal in general use in San Francisco or in Alameda County, to destination, including the cost of freight to, and the tolls and other regularly established charges incident to the handling of goods through and the shipment of said goods from such other established cargo pier, dock or terminal. The lessor is required to maintain and operate said Fourteenth Street Wharf Terminal in an efficient manner and as a public terminal for the accommodation of shipping by rail and water, including the handling of general cargo freight subject to what appear to be reasonable conditions. The lessee shall guarantee that the amount of goods which shall be routed and shipped by it annually during each of

the first four years of said lease, over and through said terminal, shall not be less than 50,000 tons and in the event that said tonnage shall be less than 50,000 tons the lessee shall pay to the lessor an amount equal to thirty cents for each ton of such deficiency as full compensation for nonperformance of its agreement; provided, that the lessor shall be relieved from full compliance with the terms of said lease in the ratio that the existence of conditions which expressly excuse performance has cut down the tonnage. The lessee shall agree that during the term of said lease it will exert its best efforts to cause all vessels necessary or convenient for the shipment of its goods to call at said terminal for the purpose of receiving shipments of goods which said lessee agrees to ship; also to pay all taxes, assessments or charges which may be levied by the state, county or city or any other tax or assessment levying body upon any interest or possessory right which the lessee may have in or to said land or improvements thereon and pay all taxes or assessments and charges levied upon goods, merchandise, fixtures, appliances and equipment owned by said lessee. The board of port commissioners agrees to continue to co-operate with the United States government in carrying forward to completion an extensive plan of channel and harbor improvements adopted by the congress of the United States and approved by the President April 28, 1928, making provision for extended harbor improvements in anticipation of the greatly increased volume of shipping originated by said Fourteenth Street Wharf Terminal and the erection of said warehouse, which is to be further increased by other structures and improvements for the convenience of shipping generally in accordance with the program adopted by said board of port commissioners.

Upon the execution of the lease the lessee is required to deposit $60,000 in gold coin as security for the faithful performance of its terms. We have set forth so much of said lease as tends to show that said warehouse was constructed and is to be used for a purpose in aid of and promotive of commerce and navigation.

The board, as a preliminary requisite, having found that it was necessary and convenient for the promotion and accommodation of shipping and commerce that said ware-

house building be erected pursuant to the plan of harbor development adopted by it, and that it was consistent with the requirements of commerce and navigation that it be leased to a person or corporation shipping large cargoes of products and merchandise to foreign as well as domestic ports, accepted the bid of $34,598, annual rental, offered by Rosenberg Bros. & Co., a corporation, pursuant to said published notice of intention to lease said premises and awarded the lease to said corporation. It is alleged, and not denied, that said Rosenberg Bros. & Co. is a responsible private corporation engaged in the business of packing, processing and shipping dried fruits and related products and that the general cargo and package goods annually shipped by said lessee equals in quantity and tonnage that of any other shipper on the Pacific coast; that said Rosenberg Bros. & Co. owns or controls numerous large warehouses and packing plants located in the main on waters and transportation systems tributary to the western waterfront of said City of Oakland; that said corporation annually ships in excess of 50,000 tons of general cargo and package goods; that said corporation proposes to install in said warehouse shipping equipment, partitions and other fixtures employed in the warehousing of dried fruits and related products in order that such products may be stored, processed, packed and shipped directly from said Fourteenth Street Wharf Terminal on ocean-going vessels to various ports of the world. In addition to said annual rental of $34,598, it is estimated that the earnings on the minimum guaranty of 50,000 tons per year will be in excess of $35,000. This added tonnage, it is claimed, will be sufficient to induce large steamship companies to make the port of Oakland a regular port of call and this circumstance will in turn cause shippers to bring their products and merchandise to said port for shipment, thus increasing the revenue and tolls of the City of Oakland and aiding and assisting the general scheme and plan of establishing a permanent harbor that will rank in commercial importance with the leading harbors of the Pacific coast.

Intervener assails certain provisions of the lease and seems to see in them a covert design on the part of the parties thereto to promote the private interests of Rosen-

berg Bros. & Co., rather than a purpose to aid the welfare of the harbor project. We have examined the provisions of the lease and it appears upon its face to be a fair attempt to execute the trust imposed upon the board by the bond issue proposition and the charter amendment. The fact that certain provisions of the lease by which the parties make an effort to provide for a fair adjustment in case of failure to comply with certain covenants in the event that fortuitous circumstances should prevent a compliance therewith may also tend to create in the mind of the lessee a temptation to resort to equivocal conduct in an effort to gain an unfair advantage is not sufficient ground to support the conclusion that such a result was contemplated by the lessor or that the lessee would be influenced thereby. The lease appears to be reasonable and no difficulties will be encountered if the parties thereto are disposed to interpret it in the light of the circumstances in which it was executed and the purposes which both the lessor and lessee covenanted to promote. It is to be presumed that they will so act.

■ The questions of the necessity for the improvements and the adoption of the method by which they will be accomplished are matters resting in the judgment of the governing body, and courts will not interfere with the exercise of its judgment unless it appears that its proposed plans are not only not the best that might be adopted but that they are so inadequate and impracticable as to inevitably result in a waste of public funds. In other words, the judgment of the board as to the necessity for the construction of the building and the methods employed for its construction will not be disturbed except in cases where the exercise of judgment or discretion is shown to have been unquestionably abused.

■ Intervener contends that the clause of the lease which grants to the lessee said building ''for the purpose of receiving, storing, warehousing, preparing, and otherwise handling goods and for shipping the same and for other industrial uses which will promote commerce and shipping'' gives to the lessee the right to use said building for unlimited purposes which may not at all correlate with the carrying out of the trust with which said board is charged by the express provisions of the charter of said

City of Oakland. We do not think that the literal language of the lease is reasonably susceptible of such a construction. Certainly the lease cannot be so construed when read as a whole and in connection with the grant to the city, the charter and the ordinance of the city in submitting the bond proposition to a vote of the people. The erection of said building and the letting of the same for the purposes set forth in said lease must have some relation to and connection with, or be promotive of the accomplishment of the main purpose, to wit, the development, improvement and upbuilding of a harbor with all the wharves, piers, warehouses and other facilities and conveniences essential to its business success and growth in order to receive judicial approval. That said lease contract authorizes an improvement and conveniences consistent with the scheme of developing and improving said harbor we entertain no doubt.

Intervener places much emphasis upon the fact that the board had no control of the management of said private corporation and for that reason the present transaction falls within the rule announced in *Egan* v. *San Francisco,* 165 Cal. 576 [Ann. Cas. 1915A, 754, 133 Pac. 294]. Cases of this character are not in point. The board in the instant case does not propose to participate in or share in the profits arising from the operation of the business conducted by Rosenberg Bros. & Co., nor is its interest in said corporation's financial success in any degree different from the interest that a landlord may ordinarily feel in his tenant's success. The Rosenberg Bros. & Co. transaction constitutes but a single unit in a comprehensive plan adopted with the purpose of improving and developing a harbor in which deep water vessels may find anchorage, promotive of commerce and navigation, and not with the primary purpose of promoting the business success of said corporation, although such a result may be an incident of said purpose. The board is primarily interested in the development and commercial success of said harbor, and as to it, it exercises exclusive control. Its relation with said corporation is that of landlord and tenant. Nor is there impressive persuasiveness in the claim that said warehouse building cannot, in the light of the situation presented, be lawfully leased for the exclusive use of said corporation

on the theory that exclusiveness as to control would destroy its public character.

In the case of *In re Mayor of New York*, 135 N. Y. 253 [31 Am. St. Rep. 825, 31 N. E. 1043], involving a proceeding to condemn wharf and other properties as a part of a plan of putting under public ownership all wharves and piers in the city of New York, the question of exclusive use was disposed of in the following pertinent language:

"If the necessity for exclusive use exists, such necessity ought to be recognized by the city, and the attempt to supply such necessity is an attempt to fulfill a public duty. The fact of exclusive use by the lessee must be considered with reference to all other property of a like nature possessed by the city, and at which all necessary and proper facilities may be afforded for the remainder of the commerce of the port.

" . . . The circumstances surrounding the case must be viewed in all aspects. The act plainly contemplates, through all its provisions, the fact that there will always remain, under the direct control and possession of the city, sufficient piers and docks for the accommodation of all commerce which may seek our port, and which has no special pier or dock leased to the owner of the vessel desiring dock facilities.

"Considering the large extent of the property of this description owned and to be owned by the city, together with the fact that there is no absolute direction to the city to lease the smallest portion thereof to anyone, we become at once convinced that the leasing which will be actually carried on under this permission will amount to no more than a special regulation of the manner in which a comparatively small portion of the whole property of this nature owned by the city shall be used for the legitimate ends of commerce.

"This mere permission to use property by leasing it to others, when the whole surrounding circumstances are examined, cannot be regarded as providing for its private use.

"When used by lessees under the facts already stated, the use is a public one. The use is public while the property is thus leased, because it fills an undisputed necessity existing in regard to these common carriers by water,

who are themselves engaged in fulfilling their obligations to the general public; obligations which could not otherwise be properly or effectually performed. And in filling the necessity for such accommodations, the city or the state is only performing its public duty."

Also directly in point is *Marchant* v. *Mayor etc. City of Baltimore,* 146 Md. 513 [126 Atl. 884].

The object of the board in erecting said warehouse was not the promoting of the business of drying and processing fruits, but it was built with the view that it would develop said harbor and harbor commerce, which is clearly a public purpose.

It cannot be successfully argued that the public had the right to occupy each and every portion of said expansive tide-land area granted to said city. If this were so, a lessee would have no security of possession. Public property in the control of a private party may, nevertheless, serve a public purpose as an aid to, or a part of a general plan. The contention of intervener that said warehouse cannot be leased for an exclusive use to said corporation can find support only upon the assumption that said warehouse and site constitute the whole and all there is of the project. Such is not the case. It is but a unit of a comprehensive plan. The board is commanded by said city charter "To make provision for the needs of commerce, shipping and navigation of the port, to promote, develop, construct, reconstruct . . . and operate all waterfront properties, including piers, wharves . . . warehouses . . . and operate all other facilities or *aids incident to the development . . . of the port as may be deemed proper and desirable in its judgment.*" (Italics supplied.) Said board is not attempting to lease or pass into the exclusive use of a private corporation all or any considerable part of the vast land acreage upon which other warehouses must be constructed as provided by charter as the commercial growth of the harbor shall require. The present warehouse, which intervener claims is not immediately needed, is but the beginning of an extensive plan of harbor improvement. Provision should be made in all cases for future growth.

Intervener further objects to the uses which are to be made of said warehouse, claiming that they are not strictly

warehouse uses. We think this objection is not well taken. Said warehouse is for the accommodation of a vast fruit-growing section of the state, and offers as an outlet to said producers the highways of the sea. As a medium of commerce it thus serves a public use. That said private corporation was awarded the lease does not make its possession any more exclusive than the possession that ordinarily passes with any other leasehold. A proper regard for the laws of health and sanitation require that a building or warehouse in which dried, processed and related fruits are to be stored awaiting shipment during the summer season should be separate and apart from buildings in which hides, tallow, cured fish and other articles of commerce of a noisome character are stored. The equipment necessary for ventilation and refrigeration and the conveniences essential for repacking and reprocessing and caring generally for such commodities may require an arrangement of the floor spaces which would constitute obstructions in the storage of general merchandise. Nor does the objection against leasing the whole of a publicly owned warehouse, rather than a portion thereof, appear to possess merit. It it admitted that Rosenberg Bros. & Co. are very extensive shippers of many varieties of dried, cured and processed fruits. It may be that one warehouse will not be sufficient in a short time to properly accommodate them as shippers. If their business, present or prospective, would warrant the board in its judgment to construct a warehouse to be used in the housing of merchandise pending transportation, we see no good reason why it should not do so. If others wish the same, or any accommodation whatsoever, doubtless provision will be made for them on equal terms with said corporation. It will be remembered that said warehouse is to be at all times conducted in a manner not inconsistent with the promotion of the commerce of said port and the board retains supervisory control over the uses to which said warehouse will be devoted. It will also be borne in mind that the building is the warehouse type, agreeing in construction with others now built or to be built, and the lessee is required upon expiration of its lease, if the lessor so requires, to remove from said building all partitions, equipment and other conveniences it may have placed therein, thus leaving the floor space of said warehouse

open and ready for the storage of miscellaneous merchandise.

Intervener has cited a number of cases which hold that statutes attempting to authorize cities or counties to engage in the manufacture and sale of cement, or to issue bonds and donate them to a private manufacturing enterprise for the purpose of encouraging the establishment of factories or private industries within the taxing district in which said factories are proposed to be located, are void. Such cases as *In re City and County of San Francisco* v. *Boyle,* 195 Cal. 426 [233 Pac. 965], have no bearing upon the principle of law which must rule the decision in the instant case.

A number of cases are to be found in which the principle of law here involved was applied to situations quite analogous to the instant case, and the said several courts held that the power sought here to be exercised was a power properly conferred upon the governing body. The case of *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124 [22 A. L. R. 1515, 208 Pac. 284], answers many of the objections urged by intervener against the power of the board of port commissioners to enter into the lease which is here under attack. It cannot be doubted that said board is fully authorized to construct warehouses for purposes which intervener terms general uses by the public. It is the use which is to be made of said warehouse which furnishes the grounds of intervener's protest. In the Veterans' Welfare Board case, *supra,* this court adopted as a part of its decision the language of the supreme court of the United States pronounced in *Green et al.* v. *Frazier et al.,* 253 U. S. 233 [64 L. Ed. 878, 40 Sup. Ct. Rep. 499, see, also, Rose's U. S. Notes], in sustaining the validity of the Home Building Association of North Dakota, which, because of its appositiveness to the several questions raised in the instant case, is reproduced:

"What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, section 176, 'Necessity alone is not the test by which the limits of state authority in this

direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happenings and prosperity to the people': Cooley, Justice, in *People* v. *Salem*, 20 Mich. 452 [4 Am. Rep. 400]. Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. *Chicago B. & Q. R. R. Co.* v. *McGuire*, 219 U. S. 549, 569 [55 L. Ed. 328, 31 Sup. Ct. Rep. 259]; *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389 [58 L. Ed. 1011, 34 Sup. Ct. Rep. 612, L. R. A. 1915C, 1189, see, also, Rose's U. S. Notes].

"With the wisdom of such legislation, and the soundness of the economic policy involved, we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire."

It appearing to this court that said lease and contract was lawfully entered into and is a valid, subsisting contract between the parties thereto, and no sufficient legal cause having been shown why said auditor of the City of Oakland should not attach his certificate to said lease and contract, it is, therefore, the order of this court that a writ of mandate do issue commanding said auditor to attach his official certificate to said lease and contract in the manner and as provided by the charter and laws of said City of Oakland.

Richards, J., Shenk, J., Preston, J., Langdon, J., Waste, C. J., and Curtis, J., concurred.

Rehearing denied.

All the Justices concurred.