[S. F. No. 15003.   In Bank.—April 18, 1935.]

CITY OF OAKLAND (a Municipal Corporation), Respondent, v. AMERICAN DREDGING COMPANY OF CALIFORNIA (a Corporation), Appellant.

Ira Abraham and Brown, Ledwich & Rosson for Appellant.

Markell C. Baer, Port Attorney, Robert M. Ford, Assistant Port Attorney, C. Stanley Wood, City Attorney, Hilton J. Melby, Chief Deputy City Attorney, and F. B. Fernhoff, City Attorney, for Respondent.

THE COURT.—This is an action to quiet title to a right of way.

Prior to 1911, a number of persons, including defendant American Dredging Company, were in possession of certain tidelands in the City of Oakland, fronting on the San Antonio estuary, claiming title thereto under a patent granted in 1889 to one James T. Stratton. This title was disputed by the city, mainly on the theory that the grant of the tidelands to Stratton was illegal and void. The dispute led to the following compromise. The legislature passed the "Tideland Act" (Stats. 1911, p. 1254) transferring to the City of Oakland all its interest in these lands, subject to specified trusts. These were, briefly, that the land should be used for harbor purposes, and for the promotion and accommodation of commerce and navigation; that the city could not convey the property but might give franchises or leases for limited periods; that it might lease them for 25 years and might provide for a right to renew for 25 years, subject to certain reservations. The statute also provided that the persons in possession of the above-mentioned lands should have a right to obtain such a lease for 25 years with privilege of renewal for a like period, subject to the right of the city to terminate the lease at the end of the first period or refuse to renew the same, and that upon obtaining the lease, they should quitclaim to the city any rights they claimed in the lands. After the passage of this act, the Oakland city council passed an ordinance authorizing the board of public works to enter into such leases, and on June 30, 1911, a lease was made and delivered to appellant, which contemporaneously delivered a quitclaim of its asserted interests. Thereafter appellant continued in possession under the lease, using its premises for dredging operations, storing dredge pipe, mooring dredges, etc. The validity of the act and the leases entered into thereunder was established by the decision of this court in *Oakland* v. *Larue Wharf etc. Co.,* 179 Cal. 207 [176 Pac. 361].

In 1927, a port commission was created for the City of Oakland, and in 1928, the city acquired a tract of land adjacent to and west of appellant's leasehold. On this land the city constructed a wharf known as "Ninth Avenue Pier", a substantial, modern structure with a steel and concrete transit shed and warehouse. Railroad tracks were constructed both on the side of the pier fronting on the estuary, and in the rear. Pending construction of the pier, however, the city, realizing the need of connecting the tracks with the outside railroad lines, entered into negotiations with four leaseholders, including appellant, with the object of securing a right of way for such connecting tracks. The negotiations failed to end in agreement, and on November 29, 1929, the city commenced this action to quiet title. On July 12, 1930, it also brought an action to condemn a right of way over the land of appellant alone. By order of court it was placed in immediate possession and has since completed the connecting tracks. On November 12, 1930, the present action was dismissed as to all lessees save appellant.

The provision for the reservations in the statute of 1911 is copied in substantially similar form in the lease as follows: "This lease is subject, however, to a reservation of a street, or to such other reservation as the said City may determine for a belt line railroad where the same may be deemed necessary by the said City, and such other reservation as the City may require including reservations for sewer outlets, and for gas and oil mains, and for hydrants, and for electric cables and wires, and for such other conduits for municipal purposes, and for such public and municipal purposes and uses as may be deemed necessary by said City." The contention of appellant is that under these reservations the city could only construct a "belt line railroad"; that the general provision for "such public and municipal purposes and uses as may be deemed necessary by said "City" did not, in view of the rule of "ejusdem generis", enlarge the city's right so as to include the type of connecting or spur track actually constructed. The position of plaintiff city is that the track in question is in fact part of a belt line system, and therefore comes within the express language of that reservation; but that the city may likewise claim the right to construct the particular trackage under the broader general reservation in the lease.

The trial court found that the Southern Pacific Company maintained a track several miles in length which is operated and used "to serve the purposes of a belt line railroad, and is in fact a belt line railroad"; that the operation of the Ninth Avenue pier as a harbor facility in connection with the promotion and accommodation of commerce and navigation necessitated track connections with this line; that the right of way awarded the city over appellant's land was a reasonable and practical one which did not unduly burden the premises or interfere with their development; and that the tracks constructed by the city "are and constitute an integral part of the said track system hereinabove referred to . . . and constitute a portion of a belt line railroad".

The appeal presents the question whether the findings of the court are supported by the evidence. Appellant suggests that a belt line railroad is one whose function is to take up freight from different industries along its route and transfer such freight to the main line railroad; and that "connecting", "drill", "lead", or "spur" tracks connect the industries with the belt line, but are not themselves part of the belt-line railroad. Several witnesses testified that the tracks in question were lead tracks or spur tracks, connecting with the belt line. Expert witnesses called by the city, however, were of the opinion that though the particular tracks by themselves could not be considered a belt line, yet they were part of a belt-line system. These latter experts included Harry Gernreich, assistant superintendent of the Southern Pacific Railway Company, in charge of train operation on their western division; R. M. Bryant, assistant engineer of the Southern Pacific Company; O. R. West, division engineer of the terminal division of the Santa Fe Company, which comprised its holdings around the bay; and Colonel E. W. Mason, vice-president and general manager of the Western Pacific Company. Mr. Bryant declared that "in railroad circles there is little or no difference or distinction between a drill track such as this drill track that we are talking about and a belt line track. It means about the same thing. It simply is a track upon which there is switching done leading from one point of the city's waterfront to another point." Colonel Mason testified that he would consider the city's tracks "as industrial trackage connecting with a belt line as a part of a belt line system".

The others were equally in agreement that the belt line included the city's tracks. This testimony supports the trial court's findings, and in the face of it, appellant's attempt to give the term ''belt line railroad'' a technical and greatly restricted meaning, cannot be sustained. So far as this record goes, it does not seem to be a subject of precise definition, but the preponderance of the opinion of the qualified experts who testified in the lower court was that the trackage in question came within the meaning of the term.

We are further of the opinion that it is not possible to ignore the broad language of the general reservation for ''public and municipal purposes'' deemed necessary by the city. Certainly the connection of its valuable pier development with some outside railroad line was essential, and carried out the basic purposes of the trusts upon which the tidelands were granted—the furtherance of commerce and navigation.

The right of way, as finally located, preserved to appellant almost its entire water frontage, and cut across the upper part of its land without separating any of its buildings from the waterfront. The court found that the tracks ''are placed flush with the ground and are constructed in such manner as not to constitute a barrier to the movement of persons, material and property'' across the right of way. The conclusion of the trial court that this was a reasonable method of location and construction is not successfully attacked by appellant.

No other points require discussion. The judgment is affirmed.

Rehearing denied.