[Civ. No. 3370.   Fourth Dist.   June 29, 1945.]

ALFREDO RAVETTINO, Respondent, v. THE CITY OF SAN DIEGO et al., Appellants.

J. F. DuPaul, City Attorney, J. H. McKinney, Deputy City Attorney, and Shelley J. Higgins, Special Counsel, for Appellants.

Luce, Forward, Lee & Kunzel and A. T. Procopio for Respondent.

GRIFFIN, J.—In this action for damages the jury returned a verdict for plaintiff and against the defendants in the sum of $45,000. The city of San Diego, through its Harbor Department, exercises in the name of the city, the powers and duties prescribed by the charter and other applicable ordinances and laws in managing and controlling the harbor of San Diego and the tidelands adjacent thereto. Through the Harbor Commission the city maintains a harbor, wharves, piers and the usual equipment for loading and unloading ships, and controls and maintains the tidelands of the city. For several years the Harbor Department owned and operated a Browning crane with six-ton lifting capacity. It was installed in position upon a truck operated by defendant Marsh, a regular employee of the Harbor Department, employed for that particular work. It was used principally for lifting heavy material along the water front and off and on boats docked in the harbor. Occasionally it was rented, with the driver, to private companies and individuals who were operating on tidelands along the water front. The Harbor Commission adopted and published certain tariff rates, which designated charges to be made for certain services performed and which also established a rate to be charged for rental of the crane above mentioned. That rental was fixed at $7.50 per hour plus 10 per cent insurance.

On February 15, 1943, defendant Marsh was directed by the port director to take the power crane to the Robbins Marine Engine Works, located on the tidelands which were under lease by them from the city of San Diego, for the purpose of lifting a marine engine out of a boat docked at that place. The Robbins Company, a private concern, had, on other occasions rented the outfit from the city at the rental published in the existing tariff rate, and in this instance there was no understanding that the work would be done for Robbins without charge. Plaintiff Ravettino had been regularly employed by the Robbins Company and on the day in question he was on the boat owned by that company when

the power crane arrived. The crane was placed on a hard road running parallel to a small dock to which was tied the boat, and from which boat the engine was to be lifted. The boom of the crane was extended over the boat. Plaintiff attached the cable to the engine. Marsh operated the power crane and lifted the engine from the boat. The truck backed up until the engine was left hanging over the hard road where it remained stationary for about a minute and a half. While the engine was in this position plaintiff was directed by Robbins, his employer, to get a dolly, located about 75 feet from the road, and put it under the engine so that it could be moved inside of the shop for repair. Plaintiff walked over to the dolly. He testified that it was from that position that he last saw the boom with the engine on it above the road, and did not at any time see the boom move towards him. He was going to move the dolly under the engine. He stooped to take hold of the handle of the dolly. Meanwhile, Marsh had swung the boom and engine over toward the dolly until the engine was swinging in the air within a few feet of plaintiff as he stooped down. The boom was brought to a stop but the engine continued to swing with a "pendulum motion." As the boom swung around, it had been lowered until it reached a point a few feet from plaintiff and about three feet above him. The boom was then stationary but the engine still swayed.

Marsh testified that he saw plaintiff stooped over the dolly; that plaintiff backed up a step or two while pulling on the handle of it and that suddenly, without warning, the engine dropped upon plaintiff, crushing him to the ground. It caused indescribable injuries and plaintiff survived only by a miracle.

Defendants make no point of excessive damages for the injuries sustained. The engine weighed about 1,800 pounds. It dropped free and about 25 feet of cable ran out on the ground. Marsh applied the brakes to the drum to stop the running of the cable. He could give no explanation of the sudden dropping. He testified that, in some way, the pawl, which held the brake pedal, was released. The brakes were applied by putting the foot of the operator upon a pedal. The brake was held down by a pawl ratchet on the pedal and could be released by pressure of the foot, which would cause the engine to drop. If the foot of the operator should hit the pawl while it was locking the brake, the load would drop.

Defendants produced an expert witness who testified that

the load on this crane could not have dropped of its own weight unless the pulley was released by foot pressure. Defendant Marsh admitted that at the time of the accident his foot was near the pawl on the brake, that in some way the pawl was released, which in turn caused the brake to be released, but that he did not release it. After the accident the crane was inspected and was found to be in good working condition.

Motion for judgment of nonsuit, motion for instructed verdict and a motion for judgment notwithstanding the verdict were each denied.

Defendants contend on this appeal that the court erred in denying the motions upon four separate grounds. The first is that the city of San Diego was not liable in damages for the negligence of the defendant Marsh because the evidence shows at the time the city was acting in a governmental and not a proprietary capacity. The second contention is this: that if the city was acting in a proprietary capacity then such act was ultra vires and beyond its municipal powers and therefore the city could not be held liable for the act of an officer or employee engaged in such ultra vires act. We will consider these two questions together.

It is conceded that if the city of San Diego, at the time in question, was acting in a governmental capacity then it is not liable in damages for any negligence of its officers or employees occurring while such officers or employees are engaged in such governmental activity. Where the activities are proprietary in character the city may be held liable. (*Rauschan* v. *State Compensation Insurance Fund*, 80 Cal. App. 754 [253 P. 173]; *Peccolo* v. *City of Los Angeles*, 8 Cal.2d 532 [66 P.2d 651]; *Yolo* v. *Modesto Irrigation District*, 216 Cal. 274, 278 [13 P.2d 908].) The distinction between the two functions is pointed out in *Chafor* v. *City of Long Beach*, 174 Cal. 478, 483 [163 P. 670, Ann. Cas. 1918D 106, L.R.A. 1917E 685]; *Benton* v. *City of Santa Monica*, 106 Cal.App. 339, 343 [289 P. 203].

The difficulty in this case arises in determining from the **facts whether or not, in the particular activity** of the municipality at the time of the commission of the tort, the city was engaged in a governmental duty imposed upon it as a political subdivision of the state. The following cases have held that certain activities of a municipal corporation are governmental in character. (*Miller* v. *City of Palo Alto*, 208 Cal. 74 [280 **P. 108] (disposal of garbage)**; *Municipal Bond Co.* v. *River-*

*side*, 138 Cal.App. 267 [32 P.2d 661] (street improvements); *Brindamour* v. *Murray*, 7 Cal.2d 73 [59 P.2d 1009] (police car used for private business); *Wood* v. *Cox*, 10 Cal.App.2d 652 [52 P.2d 565] (negligence of police officer); *Meyer* v. *San Francisco*, 9 Cal.App.2d 361 [49 P.2d 893] (operation of train in public park); *Crone* v. *City of El Cajon*, 133 Cal.App. 624 [24 P.2d 846] (operation of swimming pool).) Others have held the city to be acting in a proprietary capacity, such as *Davoust* v. *City of Alameda*, 149 Cal. 69 [84 P. 760, 9 Ann. Cas. 847, 5 L.R.A.N.S. 536] (operation of an electric light plant); *Chafor* v. *City of Long Beach, supra* (maintenance of municipal auditoriums); *Morrison* v. *Smith Bros., Inc.*, 211 Cal. 36 [293 P. 53] (water system); *Karsey* v. *San Francisco*, 130 Cal.App. 655 [20 P.2d 751] (operation of streetcars).

█ In the government and control of the Bay of San Diego and the tidelands below the mesne high tide line, the city may act in a governmental capacity or a proprietary capacity, depending on the nature of the activity.

In *Coleman* v. *City of Oakland*, 110 Cal.App. 715 [295 P. 59], where the city was held liable for damages resulting from the negligent operation of a city-owned truck while engaged in work in a city airport, it was held that the maintenance of an airport was similar to that of a harbor with its wharves and docks maintained as a landing place and haven of ships that navigate the waters. Language is quoted therein from authorities to the effect that where a city maintains a public wharf and charges toll or wharfage for the use of the wharf, it is liable to the same extent as an individual wharf owner.

*General Petroleum Corp.* v. *Los Angeles*, 22 Cal.App.2d 332 [70 P.2d 998], involved the negligence of a harbor pilot employed by the Harbor Commission to pilot a steamship from the open sea to the docks, which docks were leased by the plaintiff from the city. It was held, where plaintiff paid the defendant city a fee for the use of the pilot, pursuant to rules and regulations of the Harbor Commission, the city was engaged in a purely proprietary capacity.

In *Denning* v. *State*, 123 Cal. 316 [55 P. 1000], relied on by defendants, it was held that injury due to negligence of the employee of the Harbor Commission in maintaining a ladder on a tug-boat used for protection from and extinguishment of fires, was a result of an essential governmental activity and that the city was not acting in its proprietary capacity. The protection against or extinguishment of fires is uniformly held to be the exercise of a purely governmental function.

In *Los Angeles Athletic Club* v. *Board of Harbor Commissioners,* 130 Cal.App. 376, 386 [20 P.2d 130], the court says that in the leasing of tidelands, pursuant to authority granted by the state, a municipal corporation acts in a proprietary **function, while in granting of a franchise over the tidelands** the city acts in a governmental capacity.

We are convinced, from the evidence, when considered in connection with the cited cases, that if the city, through the Harbor Commission, had power to make use of the crane for the purposes described, at a fixed rental fee, the act of the city in so doing must be considered as being within its proprietary capacity as distinguished from its governmental capacity. Defendants practically concede this conclusion in their brief (page 21). We will therefore consider the question of the power of the city, through its Harbor Commission, to so act.

It is a fundamental rule that municipal corporations are not liable for the unauthorized acts of its officers or employees, except under circumstances not appearing here. (*Healdsburg E. L. & P. Co.* v. *Healdsburg,* 5 Cal.App. 558 [90 P. 955]; *Foxen* v. *City of Santa Barbara,* 166 Cal. 77 [134 P. 1142]; *Wichmann* v. *City of Placerville,* 147 Cal. 162 [81 P. 537].) A municipal corporation is invested with full power to do everything necessarily incident to a proper discharge of its public functions but no right to do more can be implied, and in the absence of express legislative sanction, it has no authority to engage in any independent business enterprise or occupation such as is usually pursued by private individuals. (McQuillan's Municipal Corporations (rev. 2d ed.), vol. 1, § 375; *Taylor* v. *Dimmitt,* 336 Mo. 330 [78 S.W.2d **841, 98 A.L.R. 995]; *Low* v. *Marysville,* 5 Cal. 214; *Brougher*** v. *Board of Public Works,* 205 Cal. 426 [271 P. 487]; *Vallejo Ferry Co.* v. *City of Vallejo,* 146 Cal. 392, 397 [80 P. 514].)

To determine, therefore, whether the city of San Diego, through its Harbor Commission, had power to engage in the business of renting out power cranes for the purposes **herein described, we must look first to the charter and then** to the general laws applicable to the city of San Diego and see whether or not there has been given expressly, or by necessary implication, to the city the power to rent the crane in connection with its management and control of San Diego Bay and the tidelands fronting thereon.

The Charter of the City of San Diego, section 54, article V, as amended in 1941 (Stats. 1941, p. 3429) (subd. (b)) pro-

vides, among other things, that the Harbor Commission is vested with jurisdiction and authority to exercise, in the name of the city of San Diego, such powers as are prescribed by general laws now in force and hereafter enacted, together with such additional powers and duties as may be prescribed by ordinance, this charter, or by the laws of the United States. The commission shall have jurisdiction, supervision, management and control of the Bay of San Diego fronting on the city of San Diego and within the jurisdiction of said city, including all tide and submerged lands. Subdivision (c) thereof provides that the Harbor Commission shall have power to adopt, *with the approval of the Council by ordinance,* such rules and regulations as may be necessary to exercise and carry out the powers and duties prescribed by this charter for said Harbor Commission.

It is in reference to subdivision (c) that defendant city of San Diego bases its main argument that the Harbor Commission had no power to do the things herein described in connection with the rental of the crane. It is contended that although the Harbor Commission adopted certain published rules and regulations to carry out their powers and duties, nevertheless, the city council had never approved such rules, as adopted, by ordinance, and that therefore the acts of defendant Marsh were unauthorized and were beyond the power of the city, through its Harbor Commission, to perform.

As we view it, it is mainly because of the fact that the city council, by oversight or otherwise, failed to ratify or approve by ordinance the rules and regulations of the Harbor Commission, as adopted by them, that they now claim immunity from liability.

The city of San Diego derives certain of its powers over the port of San Diego and its tidelands from the act of the Legislature conveying the tidelands to the city. (Stats. 1911, chap. 700, p. 1357.) This grant conveyed to the municipality such tidelands with the power to govern, control, improve and develop the same in the interest of commerce, navigation and fishing, together with the right to make, upon said premises, all improvements, betterments and structures of every kind and character, proper, needful and useful for the development of commerce, navigation and fishing, including the construction of all wharves, docks, piers, ships, and the construction and operation of a municipal belt-line railroad in connection with said dock system. The act provides that the city

shall never charge any unreasonable rate or toll or make any unreasonable charge, burden or discrimination. The grant gives to the city the right to lease wharves, docks, or piers constructed by it. The authority conferred under this grant is discussed in *Atwood* v. *Hammond,* 4 Cal.2d 31 [48 P.2d 20], and at page 38 refers to the amendments to said act as not affecting "the terms and conditions upon which the city was [by the original act] permitted to lease tidelands and harbor facilities. . . ." Under section 54, article V of the city charter (Stats. 1941, p. 3436) (subd. (b)) the Harbor Commission is, by its very terms, vested with *jurisdiction* and *authority* to exercise in the name of the city such *powers* as are prescribed by general laws now in force and shall have jurisdiction, supervision, management and control of the bay and tidelands. Under subdivision (c) it has the additional *power* to adopt such rules and regulations as may be necessary to carry out the powers and duties prescribed by the charter, provided such rules and regulations are approved by the council by ordinance. We do not construe subdivision (c) as in any wise limiting the *power* and jurisdiction of the Harbor Commission to carry out its duty prescribed by the charter and general laws in behalf of and in the name of the city of San Diego. The limitation, if any, goes to the question whether they may adopt rules and regulations without the approval of the council by ordinance. The *jurisdiction* and *power* to manage, supervise and control the harbor and tidelands was already conferred upon the Harbor Commission by the charter and general laws even though no rules or regulations might thereafter be adopted by that commission. This is not an action based upon a suit for fees chargeable **or rates fixed by those rules or regulations or for any** violations thereof.

In Black's Law Dictionary, third edition, page 1392, under Constitutional Law, *power* is defined as "The right to take action in respect to a particular subject-matter or class of matters, involving more or less of discretion, granted by the Constitutions to the several departments or branches of the government, or reserved to the people. Powers in this sense are generally classified as legislative, executive, and judicial. *Implied powers* are such as are necessary to make available and carry into effect those powers which are expressly granted or conferred, and which must therefore be presumed to have been within the intention of the constitutional or legislative grant." (Citing cases.)

█ In general, powers given to municipal corporations include the further power to employ such modes of procedure as are appropriate and necessary for their effective exercise. The delegation of power to municipal corporations, without providing the mode for carrying such power into effect, impliedly gives them the right to select lawful and reasonable means whereby that power is to be carried out. █ All doubts as to the propriety of means used in the exercise of an undoubted municipal power should be resolved in favor of the municipality, where there is no abuse of power or discretion. █ A municipal corporation may act through such agencies as the Legislature directs. Of course, it is necessary that the power conferred be exercised for a public use or purpose. What is a public use or purpose is not capable of absolute distinction. The courts, as a rule, have attempted no judicial definition of a public, as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. The modern trend of decision is to extend and liberally construe the term in considering the municipal activities sought to be brought within its meaning. The *power* of cities to erect structures on tidelands and to lease them to private individuals has been universally upheld.

In *Chafor* v. *City of Long Beach*, 174 Cal. 478 [163 P. 670, Ann. Cas. 1918D 106, L.R.A. 1917E 685], the city built an auditorium on its reclaimed tidelands and rented it out on occasions to private individuals. This right was upheld and it was also held that the city was acting in its proprietary capacity in maintaining the building. █ In solving the question as to whether the act done is for a public or for a private purpose, we must take into consideration the broad purposes of the grants to the municipality of the *power* to maintain its harbor facilities. (*City of Oakland* v. *American Dredging Co.*, 3 Cal.2d 220, 224 [44 P.2d 309]; *City of Oakland* v. *Williams*, 206 Cal. 315, 327 [274 P. 328].) The operation of a power crane is certainly one of the incidental functions in the operation of a port or of wharves and docks. In this instance the crane was used on a boat docked in the harbor at a dock located upon tidelands leased from the city. The use of the power crane cannot be excepted from the other activities of the harbor, and the use of it in removing the engine from this boat in question cannot be divorced from its other general purposes of lifting heavy objects, either

cargo or other objects, in and around the docks and tidelands and off and on privately owned freighters. These are some of the purposes for which the harbor and docks are maintained and from which the city derives a revenue, and indirectly, at least, it may be said that the service rendered is in the interest of commerce, navigation and fishing, and is needful and useful to the development thereof. This court cannot adopt the limited view of the defendant that the evidence establishes, as a matter of law, that the acts of the Harbor Commission and the driver of the truck here involved, were ultra vires and that therefore the city was not liable.

■ We see little merit to defendant's contention that the plaintiff was guilty of contributory negligence as a matter of law. If there was any negligence on his part it was a factual question for the jury to determine. The following dialogue illustrates plaintiff's personal views on the charge of his contributory negligence. The plaintiff, on cross-examination, answered counsel's question on that subject as follows: "Question: Maybe you did not have any business getting under the engine here? Answer: How? Let me tell you something. You sitting over there on your chair, and if I come along with a blackjack and hit you over the head, you had no business sitting on the chair, too. Right?"

■ The next question presented is a more serious one. Under the evidence, the trial court gave, at the request of plaintiff, an instruction on the doctrine of last clear chance, based on the theory that if the jury found defendant guilty of negligence and also found that plaintiff was guilty of contributory negligence, nevertheless, if the jury found that the defendant had the last clear chance to avoid the accident by moving the engine to some other location than directly over the plaintiff, plaintiff might still recover. The form of the instruction is not involved. The only point is that the doctrine is not applicable to any reasonable construction of the evidence. The evidence as to the position of the crane and engine at any given time, and as to the time elapsing between the several operations thereof, is indefinite and difficult to determine from the record. Defendant Marsh described the portion of the facts leading up to the accident as follows: "Well, I swung around in this position. This dolly was sitting there and I lacked about, I would say, six feet of being over this dolly. . . . The engine was hanging on the boom . . . when the rig had stopped the boom was swung in this position. This dolly was back here . . . north of the . . .

engine. . . . About six feet . . . Mr. Ravettino came through this gate here. The next time I seen him he was over there and he was facing north in a stooped position and he got hold of the tongue of this dolly. As I stated, he was bent over, backing out with this dolly. He backed right under this motor hanging on the boom. All of a sudden everything let go''; the engine fell in ''Twenty or thirty seconds or less'' after he got ''more or less under it.''

In his deposition, received in evidence, he testified that about 1½ minutes elapsed between the time the boom stopped before the engine dropped; that the ''boom was at the radius I wanted it and my intention was to pull it over this dolly and set it on it . . . before I could do that, Mr. Ravettino, here, as I stated before, with the dolly, backed under it. . . . It (the motor) was standing there, and let go.''

It is defendant's contention that the element of time was instantaneous and insufficient to permit the operator of the machine to do anything after plaintiff had arrived in the claimed perilous position. It is plaintiff's theory that there was sufficient time for defendant operator to act in moving the crane after discovering plaintiff's claimed perilous position and that a clear opportunity presented itself to avoid injuring plaintiff after acquiring actual knowledge of his claimed dangerous situation. The evidence on this subject is confusing and certainly not clear. We are more inclined toward the belief that, under the evidence, the instruction was not applicable and therefore should not have been given. (*Wallace* v. *King*, 27 Cal.App.2d 174 [80 P.2d 523].) However, the trial court did not instruct the jury that the doctrine of last clear chance did in fact apply to the case, nor did the trial court instruct the jury to find for the plaintiff and against the defendant if the jury believed from the evidence that the defendant had the last clear chance to avoid the injury. The court merely explained the different elements that must be present to make the doctrine applicable, and further stated to the jury that if any of the six elements are lacking the plaintiff could not recover on the doctrine of the last clear chance. Thus the court left it to the jury to determine from the evidence whether or not the doctrine should be applied. The trial court instructed the jury fully on the subject of negligence, contributory negligence and proximate cause.

A consideration of the entire evidence in this case does not

admit of the conclusion that, without the claimed error in the instructions, the verdict would have been different from the verdict actually rendered by the jury.

In *Wallace* v. *King, supra,* it was held that the last clear chance doctrine did not apply but that the verdict against the defendant should be upheld notwithstanding the error of giving such an instruction because it must affirmatively appear from the evidence and the appellate court must be of the opinion that there has been a miscarriage of justice before a reversal will be ordered. To the same effect are *Rasic* v. *Schultheiss,* 121 Cal.App. 560 [9 P.2d 550]; *Etienne* v. *Kendall,* 202 Cal. 251 [259 P. 752]; *Haney* v. *Takakura,* 2 Cal. App.2d 1 [37 P.2d 170, 38 P.2d 160].

In connection with this last point presented, defendants further contend that it was error for the trial court to permit counsel for plaintiff, over objections, to argue the doctrine of last clear chance to the jury in his closing argument without having covered it in his opening argument, citing the rule in 64 Corpus Juris, pages 248-9 to the effect that it is the duty of counsel having the burden of the issues to present the whole case, as he relies on it, in his opening argument so that the opposing attorney may then discuss the propositions he has presented. In the opening argument plaintiff's counsel strongly argued the question of the negligence of the defendants. In reply, defendants' counsel argued the claimed contributory negligence of the plaintiff. It was in reply and in response to that argument that counsel for plaintiff then argued the doctrine of last clear chance. It is stated in the briefs of respondent that copies of plaintiff's proposed instructions on that doctrine were given to counsel for defendants and the propriety of giving such instructions was discussed with the court before arguments of counsel commenced. Of course neither party knew whether or not the trial court was, in fact, going to give such an instruction until after the argument was closed and the jury was instructed. Notwithstanding the impropriety of not presenting the entire theory upon which plaintiff sought a recovery from defendants, in the opening argument, the question whether the rule was applicable under the evidence was left to the jury. They may have rejected the entire theory as well as counsel's argument on the subject.

Assuming the giving of the instruction on the doctrine of the last clear chance to be error, and having in mind

the impropriety complained of, under the evidence here set forth, we are firmly convinced that such error, if any, was not prejudicial. The negligence of the defendant was clearly established and the claimed contributory negligence of plaintiff, if any, was not very apparent. The last time plaintiff saw the crane to which the engine was attached was when he went for the dolly to a place 75 feet from it. It is apparent he did not see the men move the engine to that position, nor is there evidence that he saw it when it came to a position immediately above him. The only argument advanced by defendants is that the engine was hanging so close to plaintiff, immediately before the accident, that he should have seen it and should have known that he was in a position of danger. There is no evidence that he knew or believed he was in a position of danger. Apparently, as far as he knew, the crane and engine were still 75 feet from him. Surely, he would not be expected to anticipate that the crane would be moved and that the brake or pawl would be kicked off or would slip, allowing the engine to fall upon him, and particularly so at that location. It does not appear that there has been a miscarriage of justice nor that the errors complained of were so prejudicial that without such errors a new trial would probably result in a different verdict. (*Wallace* v. *King, supra.*)

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied July 23, 1945, and appellants' petition for a hearing by the Supreme Court was denied August 27, 1945.