[S. F. No. 15623. In Bank.—July 30, 1937.]

BOARD OF PORT COMMISSIONERS OF THE CITY OF OAKLAND et al., Petitioners, v. HARRY G. WILLIAMS, as Auditor, etc., Respondent.

Markell C. Baer, Port Attorney, Robert M. Ford, Assistant Port Attorney, and W. Reginald Jones, Assistant Port Attorney, for Petitioners.

F. Bert Fernhoff, City Attorney, and Hilton J. Melby, Assistant City Attorney, for Respondent.

Eugene E. Trefethen, Elwood Murphey and McClymonds, Wells & Wilson for Intervener.

Cushing & Cushing, Charles A. Shurtleff, Newmark & Strong and Breed, Burpee & Robinson as *Amici Curiae.*

SEAWELL, J.—Upon further reflection following the granting of the petition for a rehearing, we hereby readopt the original opinion delivered by this court in the above-entitled proceeding, with some slight changes, and by adding thereto such further reasons in support of our original conclusion as we have deemed proper in view of a re-presentation of the questions involved. We were also moved to grant the rehearing in order to give to certain parties who were not made parties in the proceeding, but who asserted beneficial interests in the subject-matter involved, an opportunity to be heard. The original opinion as hereby readopted, follows:

"This is a proceeding in *mandamus* to compel respondent, as Auditor of the City of Oakland, to certify a contract made by petitioners, Board of Port Commissioners and its members, on behalf of the city. The contract is for the employment and compensation of a real estate firm to negotiate and secure bids for the leasing of certain tidelands belonging to the city. The auditor refused to indorse his certificate on the contract on the ground that a serious controversy had arisen as to the right of the board to make leases of the property in question. The controversy arises from the fact that the property was in 1911, pursuant to statutory authority, leased to some thirteen lessees for twenty-five year periods, with pro-

vision for a right of renewal. The board, claiming that the leases were properly terminated, seeks to procure other leases. The auditor points to the fact that the lessees deny that the leases were properly terminated, and refuses to approve the expenditure of money to procure new leases until the right of the board to make new leases is determined. The petition was filed as an original proceeding in this court on the ground that the public interest required a speedy decision.

"It may well be doubted whether, under the charter of the city of Oakland, the auditor had any duty in this connection save to certify that there was sufficient unexpended money in an appropriate fund, for the payment of the sums required by the contract. Moreover, it is clear that by this obviously friendly suit between officials of the city of Oakland, an attempt was made to adjudicate the rights of various lessees holding under the present leases, who were not parties to the proceeding. Under such circumstances it would have been highly improper for this court to pass upon the rights of such parties. However, it further appears that counsel for the board notified all lessees of the proceeding, and that some of them have expressed a desire to have the question determined in the present proceeding, thus avoiding long litigation, and permitting the harbor improvement program of the city to proceed without unnecessary delay. One of said lessees, Pacific Steel and Wire Company, has intervened in the action and has filed briefs, so that for all practical purposes this lessee is the defendant in what amounts to a proceeding for declaratory relief. Several others, namely, E. K. Wood Lumber Company, Union Diesel Engine Company, Standard Gas Engine Company, Atlas Imperial Diesel Engine Company, Larue Wharf and Warehouse Company, and E. S. Collins, have through their counsel expressed a desire to have the issues promptly settled in this proceeding. Accordingly we shall deal with the matter on its merits, with the observation, however, that only one lessee, Pacific Steel and Wire Company, is a party, and only its lease is before the court. Consequently, our decision must be confined to the interpretation of the lease from the City of Oakland to Pacific Steel and Wire Company, in the light of the relevant statute and ordinance.

"The controversy had its origin sometime prior to 1911, when a number of persons and corporations were in posses-

sion of certain tidelands in the city, fronting on the San Antonio estuary. They claimed title under a patent granted in 1889 to one James T. Stratton. Their titles were disputed by the city on the ground that the Stratton patent was illegal and void. Desiring to avoid litigation, the claimants and the city entered into a compromise, which was made effective by the passage of the Tideland Act of 1911. (Stats. 1911, chap. 654, p. 1254.) By the terms of the act, the legislature transferred to the city all of its interest in these lands, in trust for the promotion of commerce and navigation. The city was given power to lease but not to convey the lands, and particularly, it was provided that upon quitclaiming their asserted interests, the persons in possession should be entitled to leases for twenty-five years with the privilege of renewal under certain circumstances. Upon the passage of the act, the city council passed an ordinance authorizing the leases, and these leases were subsequently executed and delivered, and the quitclaims received from the lessees. The validity of the act and the leases entered into thereunder was established by this court in *City of Oakland* v. *Larue Wharf etc. Co.*, 179 Cal. 207 [176 Pac. 361]. (See, also, *City of Oakland* v. *American Dredging Co.*, 3 Cal. (2d) 220 [44 Pac. (2d) 309].)

"The said leases, made in 1911, expired in June, 1936. Pacific Steel and Wire Company sought to renew for the additional period of twenty-five years, without further rental. The city offered to renew at a rental of $15,000 yearly. This was refused, whereupon the city notified the said lessee that it would not renew, and proceeded to seek other tenants, as already stated. The lessee demanded compensation for its improvements, valued by it at about $200,000, which the city also refused.

"The question presented to us is whether the said lessee had a right to renew the lease, without further payment of rental, for twenty-five years, subject to the right of the city to terminate the same upon payment for improvements; or whether the city had the right to decline to renew, upon the expiration of the original term, without paying for improvements. The answer depends upon the construction of the statute and the lease. It may be noted here that the city has terminated all of the leases of these lands.

"The relevant portions of the statute declare that the tide-lands are granted to the City of Oakland to be used for the promotion of commerce and navigation, and that they shall not be granted to any individual, provided, however, that the city may grant franchises for limited periods for wharves and other public uses, 'and *may lease* said lands, or any part thereof, for limited periods, for purposes consistent with the trusts upon which said lands are held by the state of California, and with the requirements of commerce or navigation at said harbor, for a term not exceeding twenty-five years, and on such other terms and conditions as said city may determine, including a right to renew such lease or leases for a further term not exceeding twenty-five years or to terminate the same on such terms, reservations and conditions as may be stipulated in such lease or leases, and said lease or leases may be for any and all purposes which shall not interfere with navigation or commerce, with reversion to the said city on the termination of such lease or leases of any and all improvements thereon, and on such other terms and conditions as the said city may determine . . . provided, however, that *each person, firm or corporation* or their heirs, successors or assigns *now in possession* of land or lands abutting on said lands, within the boundaries of the city of Oakland . . . *shall have a right to obtain a lease for a term of twenty-five years* from said city of said land and wharfing out privileges therefrom *with a right of renewal for a further term of twenty-five years* pursuant to the provisions of this Act and *on such terms and conditions* as said city may determine and specify, *subject to the right of said city to terminate* said lease at the end of the first twenty-five years *or refuse to renew the same,* or to *terminate the lease so renewed* during the term of such renewed lease *on such just and reasonable terms for compensation for improvements* at the then value of said improvements as said city may determine and specify.' (Italics ours.)

"Upon receiving its lease, Pacific Steel and Wire Company quitclaimed its interest in the lands, as required by the statute, and this particular lessee also transferred certain additional property as consideration. The lease, entered into June 29, 1911, recites the facts concerning the controversy, the passage of the statute, the desire of both parties to compromise and settle their differences and establish their rights,

the desire of the city to obtain dedication to public use of certain streets along the waterfront (the additional consideration mentioned above), and provides for the quitclaim of interests of the company and the dedication of the streets and relinquishment of part of its wharfing out rights by the company. The provisions of the lease pertinent here are as follows:

" 'It is further agreed . . . that the dedication of said streets and the relinquishment of part of its wharfing out rights by said Company *shall constitute and shall be the rental of said demised premises in full* and adequate payment of all rents for said demised premises *for the whole period* covered by the terms of this lease *including the renewal period thereof.*'

" 'It is further agreed that the City shall have the *right to terminate* this lease at the end of the first twenty-five years term, or *refuse to renew* the same or *to terminate the lease so renewed* during the term of said renewal lease, *on such just and reasonable terms for compensation for improvements* at the then value of the improvements as the said City may determine and specify. In this behalf, however, inasmuch as the streets now about to be dedicated for public use and the wharfing out rights now about to be quitclaimed to said City by said Company are of great present and future value the City agrees that because of the valuable considerations so for this lease now given and granted to said City by said Company that said City is *morally obligated to continue the renewal* of said lease for the further term of twenty-five years on the expiration of the first twenty-five years of said term.'

"The lease also provides that the terms and conditions of the statute 'in any way applicable thereto shall be considered to be and are hereby made a part of this lease, whether specifically stated herein or otherwise.'

■ "The first point which is clear from the terms of the statute is that those persons in possession of tidelands at the time of the compromise, who quitclaimed their interests, had a right to receive a lease of those lands for twenty-five years. They gave consideration, in accordance with the agreement, and the city not only had authority to lease to them for such period, but was legally obligated to do so. This point is not disputed.

■ "The second point is that the city had a right to terminate the leases at either of the following times: (1) at the end of the first twenty-five years (by refusing to renew) ; (2) at any time during the term of the renewed lease. This is likewise admitted by all parties, and the lease makes it perfectly clear that the declared right of renewal is only a 'moral' obligation. Accordingly, the city acted within the terms of the statute and the lease in terminating the present lease, that is, in refusing to renew at the expiration of its term.

■ "The third point which appears from consideration of the statute and the lease is that under some circumstances, the city, exercising its undoubted power to terminate, nevertheless must make compensation to the lessee for improvements. The dispute, however, is as to when such compensation must be made. . . . As pointed out above, there are only two times at which the city could terminate: at the end of the first twenty-five year period, and during the renewed term. The city admits that compensation must be made if the lease is renewed and then terminated, but denies that compensation must be made upon refusing to renew. . . .

"The question of construction narrows down to the meaning of the statute. An examination of its terms, and particularly the position of the comma in the last sentence of the above quotation, after the words 'or refuse to renew the same' indicates that the city has an absolute right to terminate prior to renewal, and that the provision for compensation of the lessee for improvements only modifies the next clause, dealing with termination after renewal. The rule of construction that 'relative and qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote' (59 C. J. 985, note 82) is applicable here, and has been applied in other California cases. (See *Los Angeles County* v. *Graves,* 210 Cal. 21, 26 [290 Pac. 444] ; *Hopkins* v. *Anderson,* 218 Cal. 62, 65 [21 Pac. (2d) 560].) ■ If any doubt is cast upon this interpretation by the language purporting to give a 'right of renewal', it must in accordance with the settled rule be resolved in favor of the city and against the private grantee. (*City of Los Angeles* v. *San Pedro etc. R. R. Co.,* 182 Cal. 652, 655 [189 Pac. 449].) "

■ It should be kept in mind at every step in the consideration of this proceeding that it is the paramount duty of government to zealously guard the public interest, unhampered by private contracts which may hinder its control of or impair the full beneficial use of its harbor, ports, waterways and tidelands which are held in trust for the promotion and improvement of navigation and commerce. We are not here dealing merely with private contracts as such, which may be freely interpreted without regard to the restrictions or limitations which the sovereign power has imposed upon the citizen in the use or occupation of public property when such use would not, in the judgment of the state, be compatible with the best interest of the public. The parties interested in this proceeding made their agreements with full notice that the Act of 1911 was the source and measure of their rights and neither the City of Oakland, the board of public works nor any other mandatory could grant more extensive rights than those clearly contained in the grant. In imposing limitations on the use of said lands the state took notice of the expanding shipping probabilities and commercial growth of the district in which the lands are situate and provided for a termination of the lease at the expiration of the first term, and, should changing conditions require it, for the return of said property to the city to be devoted to the uses for which it was held. The state's action has long since become final and it was not within the power of its grantees to render void and of no consequence the provisions of the legislature by entering into leases and contracts which are not authorized by the grant.

■ By granting to the City of Oakland, in trust, the tidelands in controversy, and prescribing the terms and conditions under which they might be leased or occupied, the legislature clearly distinguished the rights which it granted to individuals, firms or corporations who made no claims of any rights in or to said lands by virtue of the Stratton patent, or from any other source, from the claims of individuals, firms or corporations who asserted ownership, or an interest in said lands adversely to the city. This is made clear by the requirement that any adverse claimant being then in possession, upon obtaining a lease from the city should execute to the city a quitclaim deed of any interest said claimant may have asserted to said lands. The act provides that

persons who asserted no interest in, and who were not in possession of said lands, might obtain a lease for a term not exceeding twenty-five years, on such terms and conditions as the city may determine, including a right to renew for a further term not exceeding twenty-five years or to terminate the lease on such terms, reservations and conditions as may be *stipulated* in such lease (said lease permitting the use of said lands for any purpose which shall not interfere with navigation or commerce), with reservation to the said city on the termination of such lease of any and all improvements thereon, and on such other terms and conditions as the city may determine, but for no purposes which were inconsistent with or which would interfere with navigation or commerce. A number of reservations for specific purposes were named, such as the wharfing out privileges of a street; the building of a belt line railroad; sewer outlets, gas and oil mains; electric cables and wires, and other reservations which may be deemed necessary for municipal purposes. That portion of the act dealing with leases *generally* conferred upon the city all the power necessary for the protection of the trust with which it is charged, to wit, the establishment, improvement and conduct of a harbor and the construction, maintenance and operation of wharves, docks, piers, slips, quays and other utilities and appliances necessary or convenient for the promotion of commerce and navigation, and made provision for the termination of said leases on such terms, reservations and conditions as might be stipulated in the lease. To this point the terms and provisions of the act apply solely to leases made with individuals who made no adverse claims. On the other hand, the provisions of the statute, which provide that those then "in possession", being a distinct class of tenants, shall have a right to obtain a lease, were inserted as a compromise concession on the part of the state to prevent long, vexatious and expensive litigation which would have required the city to have instituted and prosecuted to a conclusion suit to quiet its title to said tidelands held by it in trust for definite public uses. In prescribing the rights of the parties as set forth in said act, the legislature had before it every contention made by claimants and every fact which bore upon the matter and it was fully acquainted with the character of the claims made, and had full knowledge of the background which constituted the basis of claimants' contentions as set

forth in the decision of this court rendered in the case of *City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 [50 Pac. 277], to which reference is expressly made in said act, when it wrote the terms upon which said controversies should be adjusted.

Each individual in *possession* was given the right to obtain a lease for a term of twenty-five years, rent free and wharfing out privileges, with a right of renewal for a further term of twenty-five years subject to the right of the city to terminate the lease at the end of the first twenty-five years, or refuse to renew it. No provision was made for the termination of said leases prior to the full twenty-five year term. Nothing is said with respect to compensation for improvements at the end of said term. But the act does provide that *if a renewal term is granted and the lease is terminated during said renewal term,* which would be during the second twenty-five year term, then such reasonable and just compensation shall be paid to the lessees for improvements made by them at the ''then value'' of said improvements as the city may determine and specify.

The city having terminated intervener's lease at the end of the first twenty-five years and having refused to renew the same it is not liable to intervener, Pacific Steel and Wire Company, or any other lessee holding by virtue of said act for the value of any improvements made by it during its period of tenancy, terminated June 30, 1936. Nor are we able to agree with intervener and others that great and inequitable results have accrued to the individuals ''in possession'' by reason of the effect which we give to the language of the act prescribing the terms of their tenures. Prior to the time the state granted said tidelands to the City of Oakland claimants in possession had been in the occupation of the state's lands by sufferance or negative permission for a considerable period of time, rent free. No valid grant of said lands had been made by the state prior to May 1, 1911. All individuals, firms or corporations who claimed to have deraigned title through or by the Stratton patent or by right of possession merely, were in no position to assert rights or title against the sovereign right of the state. Their possession was in the nature of a ''scrambling possession'' or squatter's claim. The state refused to acknowledge the claims asserted by said individuals in possession but nevertheless it

did give to them a preferential right as to tenancy to the extent set forth in said act. It separately and specially provided the terms by which persons in possession could continue their occupancy and use of said public lands for a definite term of twenty-five years, subject to its will or option to terminate the lease at the end of that period or at any time during the second twenty-five year term. If terminated during the renewed term the city was obligated to pay for the improvements made by the lessee. It is apparent from the wording of the act and the historical background of the controversy which is brought to our notice by public records, cited cases, and undisputed facts that the legislature in providing for a renewal of said lease was moved by considerations existing in one case which were entirely different from those existing in the other.

It does not appear that any great injustice or devastating results will accrue to or be suffered by the lessees by being required to conform to the provisions of said act as herein construed. Whether the lessees judged wisely or unwisely as to the economic success or failure of their ventures cannot be urged as a justification of a construction of the act which would relieve them of the obligations which we have concluded they voluntarily assumed. On this aspect of the case petitioner claims that any outlay made by intervener on account of improvements made is materially offset, if not surpassed, by benefits received by reason of its possession. Petitioner contends that much of the property which the several lessees have occupied has been sublet by them on what appears to have been highly remunerative terms. In addition to any source of income received from subletting, the lessees themselves have in some instances occupied portions of the premises for industrial uses for more than twenty-five years. Such improvements as were made on the property by intervener were made for its benefit as the result of business judgment exercised in the light of the facts and circumstances as they then appeared to intervener and as the business outlook and value of the lease term seemed to justify. The act gave definite notice to intervener as to the right of the city to exercise its option and terminate the lease at the expiration of twenty-five years.

It is a further contention of intervener that a subsequent contract made with the city and its officers gave rise

to a new or additional consideration by reason of certain parcels or strips of land which it conveyed to the city as and for a right of way convenient for the use of said property. There can be no doubt but that the rights and privileges granted by the state were intended to be and did constitute full consideration for the execution of said quitclaim instruments in conformity with the purpose and intent of said act and that being true, no subsequent agreement abridging the right of the city to terminate said leases in execution of its trust, was consistent with the letter and purpose of the parent source from which the persons in possession derived any right whatever to remain in possession.

 Intervener relies strongly upon the force and effect which it gives to certain portions of an agreement and lease which it terms a compromise agreement executed by it and the board of public works on June 29, 1911, approximately two months after the adoption of the act which constituted the basis of all rights which it is entitled to enjoy. By this agreement four parcels or strips of land were dedicated to public street and side-walk uses. Said agreement was entered into pursuant to an ordinance passed by the city council of the City of Oakland on June 26, 1911, and made effective at once. This ordinance was followed by a resolution adopted by the board of public works on June 28th, whereby that body resolved to and did execute said lease or agreement on behalf of the city. Said resolution contains many preambles in which it recites many matters of inducement, which are no part of the act, as justification for a departure from its provisions. One of its principal contentions is that a new or additional consideration springs from the dedication of said four lots for street purposes by virtue of the act of the city's officers under said agreement or lease which, it is claimed, is binding on the municipality. This is a matter that was not mentioned or considered in the act. The conditions affixed to said offers of dedication were two-fold. First: That the city without any cost or liability shall within two years completely grade, curb, gutter and pave said land so dedicated for street purposes; second: that said dedication and the relinquishment of part of intervener's asserted wharfing out rights shall constitute the rental for said dedicated premises for the whole period covered by the term of the lease *including* the *renewal period*. That the roads and

sidewalks were of benefit to intervener and to the property used by it is made clear by the provision requiring the construction and upkeep, there can be no room for doubt. As an additional burden cast upon the land dedicated to public use said agreement provided that intervener shall have the right to lay pipes, or conduits for any purpose in said streets appurtenant to the use of the property to be leased to intervener and any wires, or conduits of any kind overhead in said streets, or any tracks on said streets, provided the same does not interfere with public use of the streets. Another purported inducement or consideration for the execution of the agreement on the part of the city was that the intervener would consent to the commencement of the construction by the city of its wharf at the foot of Livingston Street according to plans adopted by the board of public works. This was but the concession of a right or privilege which the city had a right to then exercise if it was in the interest of commerce and navigation. The terms and conditions of said agreement are unquestionably inconsistent with the letter and spirit of the act, and for this reason alone must yield to superior authority. Intervener in its arguments has taken as its premise the powers attempted to be conferred by said agreement in derogation of the supreme source of power or rights which inhere in the parent act. The act made no provision for such improvements or reservations as a condition for the relinquishment of any asserted rights claimed by intervener or said lessees. The value of said rights of way, although frequently referred to in said instrument as being very valuable, does not appear. The improvements imposed upon the city by said contract were doubtless also of considerable value. Intervener was given a lease certain for a twenty-five year term with a possible maximum tenure of fifty years' occupancy of publicly owned property. The streets or ways were necessary or convenient in the operation of intervener's wharfs, warehouses, and other appliances of which it was in possession as tenant. Whether the value of the land conveyed as and for rights-of-way was greater in value than the benefits which intervener derived from the use and maintenance of said streets and sidewalks is not important for the reason that it cannot be regarded as an element or item which could justify a departure from the terms prescribed by the act. The lands

held in trust border on navigable waters. The state and federal government have expended vast sums of money in improving the harbor and channel conditions in the interest of commerce and navigation, and any contract made by the trustee of the state assuming to grant rights of alienation even for a limited period must strictly conform to the terms of the authority under which it assumes to act. It may be said that some of the rights which the lease purports to grant to the city are founded on assumed premises which have, in fact, no substantial support.

In conclusion, we repeat, that the crucial question is, did the city have the absolute right to terminate intervener's right of continued possession at the end of the first twenty-five years and prior to the beginning of the renewal period? An examination of the provisions of the statute convinces us that it did. This being so compensation on account of any improvement constructed by intervener for his use in tenancy does not apply to the term expiring June, 1936. If there is any substantial doubt as to the city's right to terminate it must be resolved in the city's favor and against the private grantee. The rule of interpretation is "that every grant by the sovereign is construed strongly in favor of the grantor". Every grant by a public officer or body, as such, to a private party is to be interpreted in favor of the grantor. (*City of Los Angeles* v. *San Pedro etc. R. R. Co.*, 182 Cal. 652 [189 Pac. 449].) This being so the lease or agreement so far as it attempts to vary or enlarge upon the terms of the statute, the sole source of the city's power to deal with said lands, is ineffective. The lease itself, in intervener's case, expressly makes the statute a part of the provisions. Compensation is provided for only in the event that a renewal term be granted. The case of *Larue Wharf & Warehouse Co.* v. *Board of Port Commrs., post,* p. 397 [70 Pac. (2d) 926] (see below), argued and submitted with the instant case, makes the point that the Larue lease which is typical of the other leases, except intervener's lease, contains no clause incorporating the terms of the statute as a part of the lease and the "moral" obligations to renew the lease do not appear in the Larue case. Be this as it may, the result is the same whether the Larue lease did or did not expressly contain the provisions above referred to. The statute, by its language, circumscribes the city's authority in the premises, and its provisions are

deemed a part of the Larue lease whether expressly incorporated therein or not. (*Brown* v. *Ferdon,* 5 Cal. (2d) 226 [54 Pac. (2d) 712].) When the city assumed to make the lease broader than the language of the act permitted its action was to that extent *ultra vires* and hence void. (*Reams* v. *Cooley,* 171 Cal. 150 [152 Pac. 293, Ann. Cas. 1917A, 1260] ; 6 Cal. Jur., p. 102, and cases cited.)

It follows that the city had power to refuse to renew the leases, and that the proposed contract prepared by petitioners is within the power of the board.

Let a writ issue as prayed.

Shenk, J., Curtis, J., Edmonds, J., Nourse, J., *pro tem.,* and Sturtevant, J., *pro tem.,* concurred.