[Civ. No. 11152. First Appellate District, Division One.—November 6, 1940.]

CITY OF OAKLAND (a Municipal Corporation), Acting Through Its Board of Port Commissioners, Appellant, v. THOMAS P. HOGAN et al., Respondents.

Markell C. Baer, Port Attorney, and W. Reginald Jones, Assistant Port Attorney, for Appellant.

Donahue, Richards & Hamlin for Respondents.

WARD, J.—An appeal from a judgment in favor of defendants following an order sustaining their demurrers to an amended complaint which plaintiff, although granted leave to do so, did not elect to further amend.

The proceeding was instituted by the City of Oakland, a municipal corporation, by and through its Board of Port Commissioners; it is in the nature of *quo warranto* and was brought under the provisions of section 811 of the Code of Civil Procedure (Stats. 1937, chap. 575, p. 1616) to determine the authority of respondents to operate and maintain a wharf within the territorial limits of the City of Oakland, upon public tidelands owned by the State of California, without having obtained therefor from said city or state a franchise or

other right. All respondents except Thomas P. Hogan are interested only as trustees or creditors under a deed of trust on the property. The wharf is constructed upon and extends from property owned by said Thomas P. Hogan, the defendant primarily interested.

The complaint alleges the capacity of plaintiff as a municipal corporation of the State of California, organized and existing under the Constitution and laws of this state and a freeholders' charter; that the Board of Port Commissioners is a department and legislative body of the city, having the powers and duties granted it by the charter; that the state is the owner in trust for purposes of commerce and navigation of certain tidelands and submerged lands, described in the complaint, along the north side of San Antonio Estuary, a navigable arm of the San Francisco Bay; that the property in question is located within the port area as such area is described in the charter of the City of Oakland, and that said estuary has been improved by the city in cooperation with the United States government by deepening the channels for the use and accommodation of ships and different types of watercraft navigating along the shores of said city and along the wharf maintained by respondent Hogan; that the wharf is used for private purposes of storage and the unloading and loading of lumber and other materials, and of docking ocean going and other watercraft.

The complaint also alleges "that said littoral property is a part of the tidelands which were granted by the State of California to the Town of Oakland by Statutes of 1852, page 180, and which were afterwards granted by said Town to one Horace W. Carpentier pursuant to an ordinance of said Town adopted May 27, 1852 and entitled as follows, to-wit: 'An Ordinance for the Disposal of the Water Front Belonging to the Town of Oakland and to Provide for the Construction of Wharves,' and a deed from said Town to said Horace W. Carpentier recorded on January 12, 1853; that said deed and ordinance were confirmed by an Ordinance adopted by the City of Oakland on April 2, 1868 pursuant to the provisions of Statutes of 1868, page 222; . . . that the rights granted to said Horace W. Carpentier, or his successors, by such instruments for the construction of wharves for a period of thirty-seven (37) years were never renewed by the said Town or by the City of Oakland as its successor. . . . That

neither defendant nor any predecessors of defendants have ever applied for or received from the State of California, Board of Supervisors of Alameda County, the City Council of the City of Oakland, or the Board of Port Commissioners of said City, or any other body or agency representing said State, City or County, any license, lease, easement, permit, grant, wharfing-out right, franchise, or other privilege, *to maintain the said* wharf above mentioned, nor do said defendants pay to the said State, City, County or Board, or other public body or agency, any rentals, franchise payments, fees or other sums whatsoever for the right, permit, franchise or privilege of maintaining, using or occupying such wharf existing from the said littoral property out over the said state-owned tide and submerged lands and over the waters of said Estuary.'' (Italics added.)

In brief, the Port Commissioners seek to ascertain by what warrant respondents claim to ''have, exercise, use and enjoy the liberty, privilege, license and franchise'' referred to in the body of the complaint.

The deed, a copy of which is attached to the amended complaint, is dated May 31, 1852, and is from the president of the board of trustees. It set out the provisions of an ordinance for the disposal of the waterfront belonging to the Town of Oakland, then in Contra Costa county, and transferred, granted and released to Horace W. Carpentier all of the land lying within the corporate limits of the town, situated between high tide and ship channel, for the purpose and exclusive privilege of constructing wharves, docks and piers, with the right to Carpentier of collecting wharfage and dockage for a period of thirty-seven years. It provided also that Carpentier or his legal representatives should, within designated periods, construct wharves at the foot of certain named streets. Provision was also made that two per cent of the receipts for wharfage should be paid by Carpentier to the Town of Oakland. Carpentier agreed to carry out the objects and purposes of the conveyance, and evidently by a prior arrangement, referred to in Carpentier's acceptance of the deed, agreed to build for the Town of Oakland a public schoolhouse. In addition the deed recited a consideration of five dollars.

The briefs of the respective parties have been directed in some instances to historical data, interesting, but not pertinent to the question involved. Respondent Hogan states that

"it has always been considered by respondent and by his father, who built the wharf and who is his predecessor in interest, to be well within the low tide line". This and other statements not appearing in the record must be eliminated in determining the propriety of the order sustaining the demurrers to the complaint. As we view the matter, the question is, are the allegations of the complaint sufficient to show the necessity of obtaining a franchise from the Board of Port Commissioners of the City of Oakland to maintain a private wharf, not involving the collection of tolls, over state submerged lands? In the absence of the complaint to so allege, we are assuming that tolls are not collected. If an allegation that they were had been made, one phase of the question here under consideration would have been more simple.

It is necessary that the complaint herein establish through its allegations that the owner of tideland or littoral land has no right to maintain a private wharf over submerged land to navigable water in the absence of a grant so to do emanating from the City of Oakland, and that the port commission is in fact "the legislative body" of the municipal corporation of the City of Oakland having jurisdiction to grant or withhold a franchise to maintain this particular wharf. As above stated, the complaint alleges that the property is within the port area as described by the charter of the City of Oakland.

The City of Oakland is properly interested in the character of its harbor and therefore in the location of wharves upon public tidelands, unregulated construction and operation of which might interfere with the growth of the port. Concentration of particular types of craft might increase or decrease the commerce passing through the port. ■ It seems to be essential to the interests of the public that harbors be operated under governmental control, with jurisdiction to direct their development in relation to commerce. In consonance with this idea the state has transferred to the city its interest in certain salt marsh and tidelands and empowered the city to control the water front. (Stats. 1911, chap. 654, p. 1254; chap. 657, p. 1258; Stats. 1911 S. C. R., chap. 20, pp. 1551–1582.) The rights of the City of Oakland with regard to the Oakland port are recognized by the Supreme Court in *City of Oakland* v. *Williams*, 206 Cal. 315, 319 [274 Pac. 328], where the court said: "The importance of the development of the natural harbor and seaport advantages which the City

of Oakland, situate on the easterly side of the San Francisco Bay, with direct and spacious connection with the Pacific Ocean, offers to the immense agricultural and commercial districts of northern and central California, is not questioned''; and in *Board of Port Commissioners* v. *Williams,* 9 Cal. (2d) 381, 390 [70 Pac. (2d) 918] : ''It should be kept in mind at every step in the consideration of this proceeding that it is the paramount duty of government to zealously guard the public interest, unhampered by private contracts which may hinder its control of or impair the full beneficial use of its harbor, ports, waterways and tidelands which are held in trust for the promotion and improvement of navigation and commerce.'' The subject of this litigation is of concern to the respondents and the City of Oakland.

In 1927 the charter of the City of Oakland was amended by establishing a port department, under the direction of five commissioners, for the purpose of promoting and developing the Port of Oakland ''through continuity of control, management and operation''. The Board of Port Commissioners was given the complete and exclusive power to sue and defend in the name of the City of Oakland in all actions involving matters under its jurisdiction relating to the port area; to make provision for the needs of commerce and navigation, including the construction, reconstruction, repair and maintenance of wharves, with the right of inspection for the purpose of requiring owners of water terminal properties to repair and maintain them, with particular reference to fire hazard and nuisances; to regulate anchorage and the loading and unloading of vessels; to enter into contracts, leases, agreements or stipulations germane to the scope of its powers, and to exercise all of the powers theretofore conferred upon the city and the city council by subdivisions 5 and 7 of section 49 of the charter. (Stats. 1927, pp. 1978–1982, secs. 206, 207 and 212.) Under the provisions of the charter the construction, extension, alteration, improvement or erection of a wharf or harbor structure within the ''Port Area'' are prohibited, unless a permit is obtained from the board. (Stats. 1927, pp. 1978, 1984, sec. 213.)

The complaint alleges that the wharf in question extends from the ordinary low tideline ''out, over and upon the said waters and state property''. So far appellant has a right, in administering its public trust, subject to and in

conformity with the delegation of power from the state, to control the proper maintenance of the wharf, at least in so far as it extends above or over the waters of the bay. (*Newcomb* v. *City of Newport Beach,* 7 Cal. (2d) 393 [60 Pac. (2d) 825]; *Atwood* v. *Hammond,* 4 Cal. (2d) 31 [48 Pac. (2d) 20]; *Wattson* v. *Eldridge,* 207 Cal. 314 [278 Pac. 236].) ■ The adoption of a charter by the people, and its ratification by the legislature, is all that is required to make it a legislative enactment repealing all laws inconsistent therewith which might otherwise be applicable within its jurisdictional, territorial confines. (Const. Calif., art. XI, sec. 8; *Taylor* v. *Cole,* 201 Cal. 327 [257 Pac. 40]; *People* v. *City of San Buenaventura,* 213 Cal. 637 [3 Pac. (2d) 3].)

Under the provisions of chapter V of part 2, title 10, of the Code of Civil Procedure, when a franchise or any portion thereof is usurped, intruded into, or unlawfully held or exercised by any person, an action may be brought against the offender by the board of supervisors of such county, city and county or "the legislative body of any municipal corporation", respectively, in the name of and within the territorial limits of such county, city and county or municipal corporation, such violations being of franchises of a kind within the jurisdiction of such board or body to grant or withhold. (Code Civ. Proc., sec. 811.) ■ It may be conceded that the grant of a franchise may be in the exercise of administrative, legislative and judicial powers. (*Newsom* v. *Board of Supervisors,* 205 Cal. 262 [270 Pac. 676].)

Respondents contend that the Board of Port Commissioners is not a legislative body of the City of Oakland; that it is primarily an administrative body. They contend that if it is a legislative body, it is not *the* legislative body as contemplated by section 811, Code of Civil Procedure, but simply a legislative body of the Port Department.

The fact that the board has certain administrative business to perform, or even certain judicial functions, as exemplified by its discretionary power, after formal hearings to grant or deny privileges is not inconsistent with legislative power on its part to be exercised independently of such administrative or judicial authority. ■ The Port Commission is a legal entity, created by charter and empowered, by approval of the state legislature, to act as an agency of the municipality. Under such circumstances whatever rights may be given to

the municipality may be bestowed upon the agency. It is not necessary to enter into a lengthy discussion of this subject as the general powers of the Port Commission of the City of Oakland have been recognized by the Supreme Court of this state in *City of Oakland* v. *Williams,* 206 Cal. 315, 320 [274 Pac. 328], where the court said: "Said charter amendment provides for the creation of a board of port commissioners, consisting of five members, vested with the exclusive control and charge of said harbor, as the successor of all the rights and powers formerly exercised by said city, and it is charged with the performance of all the duties formerly imposed upon said city, and is given such legislative and administrative powers as were deemed necessary . . . " (*Oakland* v. *Larue Wharf etc. Co.,* 179 Cal. 207 [176 Pac. 361].) Since the board acts as the agency of its principal, the city, it is *a* legislative body *of* the municipal corporation.

■ The next question to consider is, if the Port Commission is a legislative body, is it *the* legislative body, with power to legislate relative to the affairs of the "Port Area", or must such power be held under section 811 to apply only to the city council. It is contended that the definite article "the" may apply only to one determinate thing, not to one of several. The respective sides argue strenuously, and many citations have been submitted holding that the definite article "the" is often used as the indefinite article "a", and conversely. ■ Sufficient precedent appears in California and elsewhere to hold technically with appellant (*Craig* v. *Boyes,* 123 Cal. App. 592 [11 Pac. (2d) 673] ; *Noyes* v. *Children's Aid Society,* 70 N. Y. 481; *State ex rel.* v. *Board of Levee Commissioners,* 109 La. 403 [33 So. 385]), but an examination of the citations *pro* and *con* leads to the conclusion that its context and the apparent intent of the party or parties responsible for the use of the italicized word control in its interpretation and construction rather than the strict grammatical definition of the word. In *Howell* v. *State,* 164 Ga. 204, 138 S. E. 206, the court said (p. 211) : "In the construction of a statute we should apply common sense, and not apply the logical refinement of the schoolman." Section 232 (Stats. 1937, p. 2634) of the charter refers to the City of Oakland or *its* legislative *bodies,* and particularly mentions "Board of Port Commissioners".

Under our modern form of government, particularly in larger communities, legislative functions are often bestowed upon more than one commission or board, as for instance, boards of health, education, park, police, waterway or other public bodies, which give to the matters before them specialized study and enact and enforce ordinances in the interests of the public with the same effect and in the same manner as if enacted by the principal legislative body of the corporation. (McQuillin on Municipal Corporations, 2d ed., Revised, vol. 2, pp. 742, 743, sec. 707.) In the present case the "Port Department" is not only a legislative body of the municipality of Oakland, but it is the body given exclusive control over port matters. Section 212, subdivisions 26 and 27 of the charter (Stats. 1927, p. 1980) provide: "To have and exercise on behalf of the City of Oakland all the rights, powers and duties in respect to the subject matters herein provided for, that are now or which may hereafter be vested in the City, or any of its departments or officers, or which may be provided for by general law." "To do and perform any and all other acts and things which may be necessary and proper to carry out the general powers of the City, or any of the provisions of this Article, and to exercise all powers not in conflict with the Constitution of the state, or with this Charter, germane to the scope of its powers, purposes and duties."

The board has the power to take over and either withhold or "grant, all leases, concessions, easements, privileges, spur tracks and other permits, wharfing-out rights, and waterfront or other franchises relating to the harbor or port and located within the 'Port Area' " with control thereof, and may sue in the name of the City of Oakland. (Charter, sec. 216, as amended by Stats. 1931, p. 2677.) From the foregoing, we conclude that the Port Commission has authority to control wharfing-out rights and franchises relating thereto, and to sue in the name of the municipality for the usurpation, intrusion or unlawful holding or maintenance of the whole or any part of the wharf referred to in the complaint, unless the complaint alleges certain facts which negative the Port Commission's authority to control the particular wharf in question.

Section 811 of the Code of Civil Procedure gives the right to a board of supervisors or the legislative body of a municipal

corporation, in the name of the county or in the name of the municipality, to bring an action in *quo warranto* for unlawful holding etc. within the territorial limits of the county municipal corporation "which is of a kind that is within the jurisdiction of such board or body to grant or withhold". The Board of Port Commissioners is a legislative body of the Oakland municipality and holds jurisdiction to grant or withhold franchises, and to that extent has the legal capacity to bring this action in *quo warranto* without the presence of the attorney-general appearing "in the name of the people of this state". (Code Civ. Proc., secs. 803, 811.) There does not seem to be any uncertainty or ambiguity in the allegations of the complaint.

 Attention has not been called to the particular grounds upon which the demurrers herein were sustained, but from the briefs we assume it was held that the complaint does not state facts sufficient to constitute a cause of action, or perhaps they were sustained upon the theory that the complaint alleged unnecessary facts indicating that plaintiff did not have capacity to sue or to ask the court to determine the issues raised. In substance the complaint sets forth that respondent Hogan is maintaining and operating a *private* wharf for ocean-going and other watercraft. In the absence of an allegation that tolls are collected, we must assume that if such fact existed the complaint would have so alleged.

 A grant of rights in tidelands or submerged lands is subject to a public easement. Though the grant be absolute, still there were vested in the public authorities the right to administer the public trust pertaining to said lands, and the right to make changes and improvements in the interests of navigation and commerce. (*Newcomb* v. *City of Newport Beach, supra.*) The present action, however, was not brought on the theory that the private use of the wharf interferes with public interest. The paramount question involved is whether a private owner of tidelands, who charges no fee for the use of the facility, must obtain a franchise to wharf-out to navigable waters.

Under the law of England, a littoral owner had no right to wharf-out. Structures built by such owners were purprestures. No one had a right to build a wharf without a license. After the American Revolution, title to lands under tide water vested in the state subject to rights surrendered by

their respective constitutions to the United States. New states admitted were accorded the same rights as the original states. Except in cases of public emergency, or national interest, the United States has left this problem to the determination of the respective states. The decisions rendered in such states are not uniform and are primarily based upon conditions found therein or on the particular facts in dispute. In some of the early decisions it appears that, due to the inability of the government to erect wharves, etc., or because only one person would be in a position to use the wharf for dockage purposes, and as an inducement to benefit navigation and commerce, greater rights and privileges were created by statute or rested upon usage than is necessary in this period when public authority provides this service and at the same time protects the public from abuse in connection therewith. An interesting treatment of this subject is found in *Shively* v. *Bowlby,* 152 U. S. 1 [14 Sup. Ct. 548, 38 L. Ed. 331]. There is involved simply a matter of altering rules to fit changed conditions. This may be easily effectuated because at no period in the evolution of these rules has the principle that navigable waters belong to the public been lost sight of.

A great many authorities based upon varying facts have been called to our attention, but we must be mindful that the California rule is controlling as the law of this case. In *Shively* v. *Bowlby, supra,* p. 26, the court said ''that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another.''

Respondents contend that the maintenance of a wharf for the private business of the owner does not constitute the exercise of a franchise. A franchise is a special privilege conferred upon a corporation or individual by a government duly empowered legally to grant it. If the privilege is one that any individual may enjoy without a permit from the government, or if it is a right which one individual may grant to another without approval of the government, it is not a franchise. The first distin-

guishing feature of a franchise is that it must arise from the power of the government to bestow. In accordance with statutory provisions, the government may or may not require the payment of wharfage charges for the privilege, but a franchise is granted upon the theory of some accruing benefit to the public. In protection of the public, the government retains the right of regulation. It was never intended that the privilege granted to one individual should redound to the disadvantage of the public, or that the privilege should extend into a sphere beyond the control of the creator. In this case we are not dealing with a privilege that may be held indefinitely, without constraint, against the state, such as the right to vote, to a trial by jury, or freedom of speech, privileges sometimes referred to as franchises, and which are in fact rights emanating from the constitution, nor is this a franchise granted to a body for the purpose of permitting its corporate existence. Here there is a tangible substance, land in part covered by water, with the privilege of using the water for purposes of navigation. The privilege is statutory and not constitutional. The right to vote may be enjoyed by all within a class. ██ The right to the use of land under a franchise is a special privilege in which the public may be interested; it is therefore not exclusive unless expressly so declared in the grant. ██ A franchise is property, but not "more sacred than other property". (*Spring Valley W. W.* v. *Schottler,* 62 Cal. 69.)

Respondents cite cases to the effect that a franchise would involve the right to collect tolls for wharfage, and argue that since tolls are not collected for the use of the wharf in question, no franchise is involved. A franchise for a wharf may be for the purpose of taking tolls or it may simply involve the use and occupation of public lands. A municipality having control of tidelands may act as an agent of the sovereign, or as a proprietor, depending upon the municipality's rights as fixed by the state or by special statutory provision. Whether respondent Hogan holds under a lease is not of special consequence in the present proceeding as the amended complaint to which the demurrers were sustained is to determine by what warrant respondents exercise and enjoy the privilege of the use of this wharf constructed partly upon public submerged lands. If the complaint alleged that the wharf was constructed wholly upon lands

owned in fee by respondents, this action would be at an end. There is a difference between 1. A public wharf on public lands; 2. a public wharf on private lands; 3. a private wharf on public lands, and 4. a private wharf on private lands. This case comes within the third classification. According to the complaint, respondent Hogan is using public lands for private purposes. The municipality is entitled to know whether this use is by way of a lease, license, franchise or otherwise, and respondents should answer unless the complaint negatives the right of the municipality to make the inquiry and requests a judicial determination of the question.

The complaint alleges that the wharf, used for dockage purposes, extends from certain littoral property, occupied and used by respondents and adjacent to the line of ordinary low tide, waterwardly therefrom, out, over and upon the tidelands and the navigable waters of an estuary. Respondents contend that as owners of property bordering navigable water, they have the right to wharf out to deep water. The right of "wharfing-out" is a right to the exclusive use of submerged lands as by the affixing thereto, or the establishment thereon, of a permanent structure to some point within the navigable body of water, deep and wide enough to dock ocean-going vessels. It presupposes exclusive use and to that extent may interfere with fishing or navigation. "Navigable waters" have been likened to public highways. (*Newcomb* v. *City of Newport Beach, supra,* p. 404.) Owners of land abutting a highway may build on their own land and enjoy the right of access, also of light and air, but this right is distinct from their right of passing upon the street, which is a right common to the public and with which the owner of abutting land may not interfere. (*Brown* v. *Board of Supervisors,* 124 Cal. 274 [57 Pac. 82].) The owner of abutting land may not build upon the highway without some form of governmental approval.

The government may not deprive an owner of a portion of his property by obstructing his means of access to a highway. The confusion in respondents' position is due to a failure to distinguish between "a right of access" and "a right to wharf-out". The right of access, as applied to the facts of this case, merely means that there may not be built an obstruction separating the owner's land from the

navigable highway. It does not mean that the owner may wharf-out or build on the submerged lands, the property of the state, for which in this instance the municipality is the agent, without a license, grant, lease, franchise or some form of governmental permission.

In *Dana* v. *Jackson Street Wharf Co.*, 31 Cal. 118, 120, 121 [89 Am. Dec. 164], the court said: "It is claimed, however, that the plaintiff is a riparian owner, and as such has a right to 'wharf-out' against his own land; and therefore that the wharf, though built by the defendant, inures to the plaintiff's advantage; and that the present right of entry thereon is vested in him and not in the people. A riparian proprietor on navigable water has no right at common law to wharf-out against his own land. By the common law any erection below high water mark, without license, is regarded as an encroachment and intrusion on the King's soil, which the King may demolish, seize or arrent at his pleasure. (Ang. on T. W. 199.) This shows decisively that in cases of purpresture the right of entry is not in the adjacent land owner but in the crown. It has been held in some of the States that the riparian proprietor owns the soil between the high and low water mark, or that he is at least so far interested in it that he can wharf-out to the line of low water as against the people, if the wharf does not amount to a nuisance. But these decisions are all of them based upon local legislation or local usage."

In *People* v. *Southern Pac. R. R. Co.*, 166 Cal. 627, 629 [138 Pac. 103], the court said: "The defendants have a parcel of upland adjoining the tide lands in controversy and they claim the right, as riparian proprietors, to wharf-out and use the tide land in front of their upland for navigation in connection with the upland. It is settled by the decision of the Supreme Court of the United States in the case of *United States* v. *Chandler-Dunbar W. P. Co.*, 229 U. S. 53 [57 L. Ed. 1063, 33 Sup Ct. Rep. 667], decided May 26, 1913, that when the riparian proprietor holds title to the soil under the water in front of his upland, and holds it by virtue of his riparian ownership, in fee, such title is subject to the public easements of navigation and fishery, that when the public authorities see fit to make improvements on the land below high-water mark for purposes of navigation, the riparian owner must yield thereto, and that

his right is subordinate to the public rights. There are many other decisions of the Supreme Court of the United States substantially to the same effect. Under these authorities it is apparent that the littoral rights of the defendants cannot impinge upon the control by the state of tide lands for the public purposes of navigation and fishery, or affect the public easement for those purposes.''

In *Henry Dalton & Sons Co.* v. *Oakland,* 168 Cal. 463 [143 Pac. 721], the court approved *People* v. *Southern Pac. R. R. Co., supra,* and at page 466 said: " . . . under our laws plaintiff as littoral or riparian owner has no right of access as to the deep waters of the bay over intervening tidelands.'' In *City of Oakland* v. *Wheeler,* 34 Cal. App. 442, the court said (p. 453) [168 Pac. 23] : " . . . owners of land upon the littoral of a navigable bay have no right of access to deep water over intervening tidelands.'' In *Boone* v. *Kingsbury,* 206 Cal. 148 [273 Pac. 797], it was held that littoral owners may not do that which they deny others the right to do on lands held in trust for all the people. In *Oakland* v. *E. K. Wood Lumber Co.,* 211 Cal. 16, 23 [292 Pac. 1076, 80 A. L. R. 379], the court said: "The erection of a wharf, dock or other construction over tidelands by individuals without license is an encroachment upon the sovereignty or a purpresture which belongs to the state as the owner of the soil to which it is affixed.'' In *City of Newport Beach* v. *Fager et al.,* 39 Cal. App. (2d) 23 [102 Pac. (2d) 438], the court said: "We are satisfied that the correct rule is that the littoral owner of uplands upon a navigable bay has no right of access to the waters of the bay over intervening tidelands, whether filled or unfilled, which have been granted by the state to a city in trust for the purpose of improving such navigable bay in furtherance of commerce and navigation. . . . Although it is true that as against a stranger a littoral owner of upland bordering upon navigable waters may not be deprived of his right of access to such waters, no such right exists in favor of such littoral owner as against the state or its grantee in the exercise of a lawful use or purpose.''

In brief, we hold that there may be no interference with the right of a littoral property owner to access to an abutting navigable channel except by governmental power and for a lawful use and purpose. The right to "wharf-out'' or construct on land between the littoral owner's prop-

erty and navigable water may not be maintained except by grant from the owner of the intervening property. The complaint alleges that the wharf maintained by respondents extends from ordinary low tideline out, over and upon state property for a distance of 300 feet.

The cases cited by respondents are not in point. In *People* v. *Monstad,* 209 Cal. 658 [289 Pac. 847], it was held that the Broughton Act had no application to the leasing of tide or submerged land for the purpose of the erection thereon by the lessee of a private wharf. In *Pacific Coast Steamship Co.* v. *Kimball,* 114 Cal. 414 [46 Pac. 275], in dealing with tidelands, it was held in substance that a governmental power might act as a proprietor or as agent of the sovereign in the giving of a lease, and that, unless there was an express grant, the lessee might not usurp the right of a franchise to conduct a public utility. It was pointed out that in its very nature a wharf is not necessarily a public utility.

In the instant case we are not dealing with a public utility wharf as such, but rather with a wharf built upon state property, which respondents contend does not involve the exercise of franchise rights. The cases cited by them merely recognize the possibility of the existence of the right to wharf-out as incidental to littoral ownership. It was not essential to those decisions to determine the precise question involved here, namely, the necessity of obtaining a franchise to maintain a private wharf, not involving the collection of tolls, over state owned submerged lands. In *Oakland* v. *E. K. Wood Lumber Co., supra,* the court held that the lease in that case did not expressly grant a franchise. In this case, the question is, by what authority does respondent Hogan maintain this wharf.

We now approach the question whether or not the complaint alleged facts which negatived the Port Commission's authority to grant a franchise, and control the wharfing-out rights of respondents. Upon this question the legal effect of the Carpentier grant, copy of which is attached to the complaint, and its specific provisions, are vital. The Carpentier grant of 1852 purported to convey the entire water front of the Town of Oakland to the grantee. The act of 1854 (Stats. 1854, p. 184) reincorporated the Town of Oakland as the City of Oakland and provided that the boundary lines of the city should remain the same as those of the

former town. Under the Statutes of 1861, page 386, the corporate boundary of the city seems to have been enlarged. Discussing this phase of expansion, the Supreme Court in *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160, 171 [50 Pac. 277], commented as follows: "Whatever effect this amendment may have had in extending the municipal limits of the city of Oakland from and after the date of its passage, it cannot be allowed any retroactive effect upon the property rights of the city or of her grantees, and if the construction which it attempts to place upon the act of 1852 is erroneous, as it clearly is, the courts, in determining the rights of the parties to this action, not only may, but must, disregard it. The same remarks are applicable to the act of April 24, 1862 (Stats. 1862, p. 337), by the second section of which the legislature again sought to give a more particular definition to the original boundaries of the town of Oakland, and in so doing extended it to the highest tide line of the estuary, thereby including a wide expanse of salt marsh above the level of ordinary high tide." The Oakland Water Front case contains an exhaustive record of historical, legislative and judicial proceedings in connection with the dispute between the City of Oakland and Carpentier. Relative to the 1852 grant, the court reached the following conclusion (p. 196): "The attempted transfer to him of the waterfront was void, and the city of Oakland was free to assert her rights by any action or other proceeding appropriate to that state of the case." However, claims, demands, controversies, disputes and litigation (*Oakland* v. *Carpentier*, 13 Cal. 540; *Oakland* v. *Carpentier*, 21 Cal. 642) continued. In 1868 a compromise was effected. In the same decision (*Oakland* v. *Oakland Water Front Co., supra*) the court said (p. 201): "The conclusion, I think, necessarily follows that from and after the second day of April, 1868, the city of Oakland ceased to be the owner as trustee, or otherwise, of any portion of her waterfront except those portions secured to her by the compromise of that date, and such streets, thoroughfares, and other parcels as may have been previously dedicated to public use. As to all such places the transfer to the Water Front Company and its assigns was subject to the public easement, and the city as trustee for the public is no doubt entitled to a decree in this action defining her right of control over the lands so dedi-

cated.'' The compromise was a confirmation of the validity
and effect of the 1852 deed, with a possible variation of
certain boundary lines. Any rights or interests held by
Carpentier or his successors must be determined basically by
the 1852 deed, in connection with which it was held in *City of
Oakland* v. *Wheeler, supra,* pp. 453, 454: ''Appellants and
their predecessors in ownership of this property exercised for
thirty-seven years, from some time in June, 1852, until a cor-
responding date in 1889, the wharfing-out privilege granted by
the town of Oakland to Carpentier in his deed of the former
date. The exercise of the right conferred by this instrument,
whether it be termed a lease or by whatever designation it be
characterized, estopped the defendants and their predecessors
so exercising it from claiming title to or right or easement in
the land below low tide on which the wharf stood as against
the city of Oakland from whom they derived the right so
exercised during those years. Assuming that it was possible
for the defendants to have acquired title to this land below
low tide, or any privilege to use it for wharfing-out, by
adverse possession under any circumstances—which we do
not concede to have been possible in this instance—still they
did not so acquire either title or wharfing-out privilege, be-
cause before the termination of their privilege or lease under
the Carpentier deed this land was withdrawn from sale by
the Constitution of 1879 (Const. 1879, art. XV, sec. 3), and
it has been held that the title to tide-lands withheld from
sale cannot be acquired by adverse possession. (*Patton* v.
*City of Los Angeles,* 169 Cal. 521 [147 Pac. 141]; *People* v.
*Southern Pacific* [*R.*] *Co.,* 169 Cal. 537 [147 Pac. 274].) So
that having no deed to this property, and having acquired
no title thereto or privilege of using this land, or user
thereof, below the low-tide line by adverse possession, the
defendants show no wharfing-out rights belonging to them
at the time this summons was issued upon which they could
stand in a claim for damages to or compensation for the tak-
ing of land below the low-tide line, for the defendants had
no right of access to navigable water from their property.''

In *City of Oakland* v. *Buteau,* 219 Cal. 745, 752, 753 [29
Pac. (2d) 177], the court said: '' . . . the town of Oakland
could not convey to Carpentier more than it had received
from the state, and it had received from the state only the
lands 'between high tide and ship channel'. When, there-

fore, the town granted the 'waterfront' it must be deemed to have granted only what it possessed, namely, the lands between high tide and ship channel. For many years the meaning of the term 'ship channel' was uncertain and undefined. It was indicated if not definitely decided in *City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 [50 Pac. 277], that the term meant the ordinary line of low tide. The defendants claimed on the prior appeal in this case and now claim that the definition of the term as the low-tide line is too restrictive and limited; that it means something more than a mere boundary line, and imports a right of access to navigable waters. But it was definitely decided on the former appeal in this case that the term meant the line of low tide. That determination has become the law of the case, and the defendants would seem to be now foreclosed from contending otherwise. We think that the term as so used and now defined indicates no more than a boundary line, and the term has no significance other than to form the southern boundary of the defendants' land as confirmed to it in the judgment, and cannot be enlarged to import a right of access to navigable waters."

The following language in the deed of 1852 is worthy of comment: " . . . have granted unto Horace W. Carpentier and his legal representatives, the exclusive right and privilege of constructing wharves, docks and piers, at any point or points within the now corporate limits of the town of Oakland, with the right of collecting wharfage and dockage for a period of thirty-seven years." The word "exclusive" was not necessary and did not enlarge the scope of the wharfing-out right as the entire water front was conveyed to Carpentier. Whatever right to wharf-out was conveyed, it expired within "a period of thirty-seven years". ▮ Assuming that this conclusion is incorrect, still submerged lands, the property of the state, are held in its limited sovereignty for the public, and when conveyed to an individual are merely received as a trust, subject to police power, power of taxation and the right of eminent domain. To that extent the lands are incapable of being placed beyond the state's or the state agents' control. Such lands differ from lands open to preemption and sale in that the submerged lands may be of use to the public for fishing purposes, or, as a navigable highway, for commerce. Parcels of such land may

be disposed of without impairing the interests of the public and for the great benefit of the entire community, and then only subject to the right of control by the state or its agency.

 Whatever the rule may have been in other states during the early period of this country's history, the growth of commerce and navigation requires continuity of governmental control as a condition to the maintenance of a private wharf in public waters—this being essential to a scheme for the development of harbors and ports as opposed to a rule requiring the governmental authority to stand idly by while a wharf is being erected, and thereafter, upon a showing that it interferes with the public interest, to bring suit to abate the nuisance upon the theory that the wharf interferes with navigation. If, on the other hand, the governmental authority should act or threaten to act in a discriminatory or arbitrary manner, the party in interest has a remedy by appeal to the courts.

During oral argument, and subsequently in briefs, attention was called to Political Code, section 675, relative to the power of the director of finance to convey title to real property belonging to the state of California whenever its sale or exchange is authorized by law and there is no other agency specifically directed and empowered to execute such grants, it being contended in this connection that jurisdiction over tidelands thus passed from the various bodies formerly controlling its disposition.

The State Lands Act of 1938 (Extra Session 1938, p. 23) creating and vesting in the State Lands Commission the power and duty of acquiring by purchase or condemnation interests in privately owned lands to facilitate the operation and purpose of the act, particularly with reference to the control of mineral and oil lands, was amended in 1939 (Stats. 1939, chap. 646, p. 2074) by adding a new section, designated as section 48 providing: ''The commission shall have exclusive jurisdiction over all ungranted tide lands and submerged lands owned by the State, and of the beds of navigable rivers, streams, lakes, bays, estuaries, inlets, and straits. All jurisdiction and authority remaining in the State as to tidelands and submerged lands as to which grants have been or may be made is vested in the commission. The commission shall exclusively administer and control all such lands, and may lease or otherwise dispose of such lands, as

provided by law, and in accordance with such rules and regulations as the commission shall adopt.'' Respondents contend that all statutes theretofore entrusting to any other agency or public body power in connection with tide or submerged lands, or which are in conflict with section 48, were thereby repealed.

The above section (48) must be irreconcilable, repugnant and inconsistent with other statutes before repeal by implication may be favored. ▮▮▮ The general rule is that it must appear that there is no possibility of concurrent operation or that the section is a complete revision of the earlier statute before a repeal is effectuated. (*Hammond* v. *McDonald*, 32 Cal. App. (2d) 187 [89 Pac. (2d) 407]; *Penziner* v. *West American Finance Co.*, 10 Cal. (2d) 160 [74 Pac. (2d) 252]; *Washington Lumber etc. Co.* v. *McGuire*, 213 Cal. 13 [1 Pac. (2d) 437].) ▮▮▮ The meaning of section 48 is that when minerals are to be extracted from tide or submerged lands the power or control is given exclusively to the state lands commission. This conclusion is borne out by the call of the Governor, providing in part: ''To consider and act upon an act relating to lands owned by the State, creating a State Lands Commission and prescribing its duties and powers with respect to such lands, and particularly the protection and extraction of oil and gas deposits and other minerals from such lands of the State.'' The title does not refer to each and every parcel of land owned by the state, but it does refer to oil and gas and all mineral deposits. The section, when read in its relation to other sections of the act, indicates that the State Lands Commission holds exclusive jurisdiction only in those matters which are specially delegated to it, namely, state lands or even submerged lands for the purpose of reserving minerals. It is inconceivable that the legislature intended that which it did not say, namely, to remove jurisdiction over tidelands from the control of the numerous counties, municipalities, harbor and port commissions in existence in this state, which bodies for years have been entrusted with the establishment and improvement of harbors, and to that extent with the maintenance and operation of wharves and other structures necessary or convenient for navigation. The legislature has generally treated the construction of

docks, piers, etc., as a local matter. In 1939, the same year as the passage of section 48, a new section, 522, was added to the Harbors and Navigation Code. (Stats. 1939, chap. 226, p. 1479.) By such section recognition was given to the continued jurisdiction of the legislative body having control over publicly owned submerged lands. The conclusion must be reached that section 48 of the State Lands Act has no application to this proceeding.

Appellant contends that respondents' lands are not littoral or riparian. We refrain from passing on this phase of the controversy as the complaint alleges in reference to the situs of the property: "That said littoral property so occupied and used by defendants is located", etc.

Appellant also urges that in addition to the power under the charter provision to inaugurate this proceeding, authority to control the port, tide and submerged lands, and bring this suit, is found in certain sections of the Civil Code and the Harbors and Navigation Code. It is not necessary, in view of the authorization under the charter, to consider the provisions as applicable to this appeal except as they relate to the procedure involved in granting a right to erect or construct a wharf or impose a penalty for failure to keep the structure in repair.

■■■ The charter does not specifically set up procedural provisions for the granting of wharfing-out privileges. In that situation, the municipality may rely upon the provisions of state law not inconsistent with other provisions of the charter. (*City of Oakland* v. *Williams*, 15 Cal. (2d) 542 [103 Pac. (2d) 168]; *City of San Diego* v. *Kerckhoff*, 49 Cal. App. 473 [193 Pac. 801]; *Key System Transit Co.* v. *City of Oakland*, 124 Cal. App. 733 [13 Pac. (2d) 979]; *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265 [118 Pac. 796].) ■■■ Eliminating the question of tolls, section 528 of the Civil Code provides in substance that a corporation may not construct a wharf without authority from a governing body. Section 531 makes this provision applicable to natural persons. These sections should be read in conjunction with certain sections of the Harbors and Navigation Code, division VII, chapter 1, sections 4000–4002, 4003, 4005, 4006, which set up a procedure necessary to obtain a franchise. (*City of Oakland* v. *El Dorado Terminal Co.*,

filed this date (*ante,* p. 320 [106 Pac. (2d) 1000].) Respondent cites *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545 [147 Pac. 238], to support the contention that these sections apply only to toll franchises. In the Reed Orchard case, the court was considering section 2921 of the Political Code, the basis for the enactment of section 4017 of the Harbors and Navigation Code, which relates specifically to railroad corporations in their relation to the construction of wharves as terminal bases. The statement in that case may be correctly construed to mean that a private wharf may not be erected on public lands except by a railroad company under special circumstances, and so construed only when the section is read in connection with other code sections. (Civ. Code, sec. 465.) In *Santa Cruz* v. *Southern Pac. R. R. Co.,* 163 Cal. 538, 548 [126 Pac. 362], the court said: "Sections 465 and 475 of the Civil Code, in effect, give the privilege of constructing and operating a railroad over any public bay or roadstead in the state, not within a city or town, to any railroad corporation that accepts the privilege and uses it. As to the waters of such bay or roadstead which are within a city or town, a grant from the council is necessary." The question of procedure is not vital in the instant case. The sufficiency of the complaint is the question on this appeal, and further consideration of the "procedure" will not be pursued as, assuming that the code sections do not apply (which we do not hold), the form of petition and manner of granting or withholding franchises may with propriety be provided by ordinance. (Oakland City Charter, sec. 46, subd. 7; Stats. 1911, p. 1579; Stats. 1927, secs. 211, 212, 216, pp. 1980, 1981.)

Appellant, acting under the charter, as the legislative body in charge of the development and promotion of the Port of Oakland, is vested with jurisdiction to grant or withhold a franchise to operate a private wharf erected in part upon public lands, involving no tolls or fees, and as such legislative body within the meaning of Code of Civil Procedure, section 811, is entitled to maintain *quo warranto* proceedings against alleged usurpers of a wharfing-out franchise.

The judgment is reversed and the cause remanded to the superior court with instructions to overrule the demurrers

and allow the respondents a reasonable time within which to answer.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 6, 1940.